IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

WARREN LANE,

                Plaintiff,                Civil Action No.
                                        9:07-CV-0751 (GLS/DEP)

      vs.

SHARON E. CARPINELLO, *et al.,*

                Defendants.

_____

APPEARANCES:

<u>FOR PLAINTIFF</u>:

Warren Lane, *Pro Se*
2440 Hunter Avenue #10C
Bronx, New York 10475

HON. ANDREW M. CUOMO               DEAN J. HIGGINS, ESQ.
Office of the Attorney General
State of New York
Department of Law
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

     Plaintiff Warren Lane, a former New York State prison inmate who

alleges that he is "legally blind", has commenced this civil rights action

pursuant to 42 U.S.C. §§ 1983, 1984, 1985 and 12,101 against ten

defendants, eight of whom are employed at the Central New York

Psychiatric Center ("CNYPC"), alleging various constitutional and statutory

violations committed by the defendants during the period of his

confinement in CNYPC.  In his complaint, plaintiff asserts claims relating to

his involuntary confinement at CNYPC in 2006, commencing upon his

conditional release date from prison.  Plaintiff maintains that he was

transferred into CNYPC in violation of his constitutional right to due

process, and that while there he was subjected to further violations,

including discrimination based upon his disability, excessive force, failure

to intervene to protect him from harm, indifference to his medical needs,

and retaliation.  Plaintiff requests redress in the form of compensatory and

punitive damages as well as declaratory relief.

Currently pending before the court in connection with this action are

two motions.  Plaintiff initiated the motion process by seeking partial

summary judgment with respect to his claim that he was denied due

process with regard to his commitment to CNYPC and for violations of Title

II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12,101 *et

seq.*, while he was held there.  Defendants responded in opposition and

2

cross-moved for summary judgment requesting dismissal of plaintiff's complaint in its entirety.  Having carefully reviewed the extensive record now before the court, I recommend that plaintiff's motion for partial summary judgment be denied, defendants' motion for summary judgment be granted, and plaintiff's complaint be dismissed in its entirety.

I.   BACKGROUND[1]

Plaintiff, who is visually impaired, was incarcerated by the New York State Department of Correctional Services ("DOCS") for approximately twenty-five years following his conviction for multiple sex offenses.[2] Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57-4) p. 1.  Prior to his DOCS conditional custody release date, plaintiff was evaluated by two physicians from the New York State Office of Mental Health ("OMH");

---

[1]    In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff.  *See Burtnieks v. City of New York,* 716 F.3d 982, 985-86 (2d Cir. 1983) (citations omitted).  It should be noted, however, that many of plaintiff's allegations regarding his case and treatment while at CNYPC are vigorously contested by defendants.

[2]    Plaintiff was given a vision impairment assessment on July 22, 2005 while incarcerated at Sullivan Correctional Facility, and was diagnosed as having a prosthesis of the left eye and glaucoma and increasing myopia in the right eye. Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57-4), Exh. B.  Defendants acknowledge the existence of one artificial eye, but state their belief that plaintiff is able to use his other eye to read, write, and operate a calculator.  *See* Affidavit of Jeffrey Nowicki, LCSW-R ("Nowicki Aff.") (Dkt.  No. 79-5) ¶¶ 10-11; Defendants' Response to Plaintiff's Request for Admissions (Dkt. No. 62-3) ¶ 3.

based upon their evaluations, on September 12, 2006, on application of

the superintendent of the Sullivan Correctional Facility made pursuant to

section 9.27 of the New York Mental Hygiene Law ("MHL"), plaintiff was

admitted involuntarily into CNYPC under close observation for participation

in the sex offender treatment program ("SOTP").[3]  Lane Aff.  (Dkt.  No.  57-

2) ¶¶ 1-5.  Although his stay at the CNYPC lasted for less than two

months, plaintiff's many complaints regarding his commitment and

treatment at that facility give rise to this suit.

Admission records reflect that upon being admitted to CNYPC,

plaintiff was "very agitated due to his admission to the SOTP and was

making statements that he would due [sic] whatever it took to violate and

get sent back to prison."  Higgins Decl. (Dkt. No. 79-4) Exh. D, p. 92.[4]

When admitted to CNYPC, plaintiff's mobility cane, which he claims to

require when he is outdoors or in an unfamiliar environment, was

confiscated by defendant Steven Coppola, a treatment assistant at the

---

[3]     The CNYPC is a secure adult psychiatric center established within the
New York State Office of Mental Health.  Defendants' Statement Pursuant to Local
Rule 7.1(a)(3) (Dkt. No. 79-2) ¶ 3.

[4]     To protect plaintiff's privacy, and with the permission of the court,
defendants filed plaintiff's records from CNYPC as well as those records from the
Commission on Quality of Care and Advocacy traditionally and under seal as Exhibits
D and E, respectively, to the Declaration of Dean J. Higgins, Esq. ("Higgins Decl."),
Dkt. No. 79-4.

4

facility.  Complaint (Dkt. No. 1) p. 6.  According to defendants, plaintiff's

cane was taken pursuant to a CNYPC safety and security policy that

precludes any resident of the center from possessing such an item.

Nowicki Aff.  (Dkt. No. 79-5) ¶ 7.  Plaintiff alleges that thereafter he was

denied reasonable accommodations for his blindness despite his

numerous requests.  Complaint (Dkt. No. 1) p. 6.  Defendant Jeffrey

Nowicki, who was at all times relevant to plaintiff's complaint the Team

Leader of the SOTP at CNYPC and is currently the Chief of Mental Health

Treatment Services of the SOTP, explains that while plaintiff's cane was

confiscated, he was offered a wheelchair or walker, both of which plaintiff

refused.  Nowicki Aff. (Dkt. No. 79-5) ¶¶ 1, 7-8.  Nowicki states further that

staff at CNYPC were aware of plaintiff's left eye prosthesis and that plaintiff

was given medical support for this condition.  *Id.* ¶ 10. Plaintiff's in-patient

nursing assessment conducted on September 12, 2006, upon his

admission to CNYPC, reflects plaintiff's mobility status as fully independent

without any notations that a cane or walker was needed. Higgins Decl.

(Dkt. No. 79-4) Exh. D, p. 38.

On October 13, 2006, one month after his transfer into CNYPC,

plaintiff wrote a letter to defendant Donald Sawyer, director of the facility,

demanding compliance with the ADA and that he be provided with

reasonable accommodations for his disability, including a laptop computer

with zoom text, a scanner and inkjet color printer, a 7x magnifier, books on

tape, a high intensity lamp and 20/20 pens.  Complaint (Dkt. No. 1) p. 9;

Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57-4) Exh. C;

*see also* Defendants' Response to Plaintiff's Statement Pursuant to Local

Rule 7.1(a)(3) (Dkt. No. 78) ¶ 5.  Plaintiff claims that, in response,

defendant Nowicki told him that accommodations were unnecessary

because plaintiff "would not remain at CNYPC for much longer."  Complaint

(Dkt. No. 1) p. 9.  Feeling threatened by Nowicki's statement, Lane sent a

letter to defendant Sharon Carpinello, Commissioner of the OMH,

requesting that she place him into protective custody and transfer him from

CNYPC.  *Id.*  Plaintiff did not receive a response to that letter.  *Id.*

Plaintiff claims to have been subjected to three separate attacks

during his stay at CNYPC.  On September 18, 2006, while in the recreation

yard, plaintiff was struck by a football and subsequently attacked by a

fellow patient, suffering injury to his face, nose and jaw.[5]  Complaint (Dkt.

_____

[5]     The record is unclear as to whether the incident occurred on September 17 or 18, 2009.  The parties agree, however, that plaintiff was involved in an altercation in the recreation yard during that period, as a result of which he later sought to pursue criminal charges.

No. 1) p. 7; Plaintiff's Deposition Transcript ("Tr.") pp. 27-33.[6]   Plaintiff

claims that upon requesting medical attention he was told by defendant J.

Crociata, a nurse at CNYPC, "[t]here's nothing wrong with you," and denied

treatment.   Complaint (Dkt. No. 1) p. 7.  Plaintiff's CNYPC records

contradict his version of the events, instead reflecting that defendant

Crociata witnessed plaintiff arguing with another patient near the recreation

yard door entrance and tried to intervene.  Higgins Decl. (Dkt. No. 79-4)

Exh. D, p. 114.  When Crociata approached Lane and inquired if he was

injured, Lane stated that he was not touched and became angry when

Crociata asked what had happened, accusing Crociata of being a racist.

*Id*.  Plaintiff was visited by a doctor later that evening during rounds;

although the doctor offered to see him, plaintiff again said he was "okay"

and declined any treatment.  *Id*.

Following the September 18, 2009 incident, plaintiff demanded that

he be permitted to file criminal charges against the patient who assaulted

him, but was allegedly denied the opportunity to contact law enforcement

authorities by Nowicki and defendants Michael Babula and Frank Menz,

––––––––––––––––––––

[6]       Plaintiff's deposition transcript, which was filed as Exhibit F to
Defendants' Motion for Summary Judgment (Dkt. No. 79-7), will be referenced herein
as "Tr."

both of whom are treatment assistants at CNYPC.  Complaint (Dkt. No. 1) p. 7.  Nowicki informed plaintiff that mediation was available to handle such disputes, making it unnecessary to contact the State Police.[7]  *Id*.  Plaintiff claims defendant Nowicki then threatened that if he insisted on filing criminal charges, Nowicki would have his parole violated.  *Id.*  As a result of the September 18 attack plaintiff no longer felt safe, particularly in light of his blindness, and was fearful of losing his remaining ability to see in another altercation.  *Id.*  Plaintiff requested that Nowicki either transfer him to another facility or place him in protective custody.[8]  *Id.*  After both requests were denied, plaintiff subsequently sent a written request to defendants Sawyer and Sharon Barboza, Director of the SOTP at CNYPC, again asking for protective custody and transfer.  *Id.*  Plaintiff received no response from either Sawyer or Barboza.  *Id.*

Plaintiff's CNYPC records show that a call was placed to the New York State Police when plaintiff indicated that he wanted to pursue criminal charges, and that plaintiff became belligerent and threatening after the

---

[7]     Plaintiff ultimately agreed to settle the matter through that channel.  *See* Higgins Decl. (Dkt. No. 79-4) Exh. D, pp. 134-35.

[8]     Defendant Nowicki asserts that the CNYPC staff was not aware that plaintiff needed protection and that it was actually the other residents who needed protection from the plaintiff.  Nowicki Aff. (Dkt. No. 79-5) ¶ 17.

incident, touting his lengthy disciplinary record in prison and warning not only that he would "kick the shit" out of the other patient with whom he had the problem, but also that he would soon be running the ward.[9]  Higgins Decl. (Dkt. No. 79-4) Exh. D, pp. 116-19.  Plaintiff did contact his parole officer regarding the incident and also filed a complaint with Nowicki.  *Id*.

The next relevant incident occurred on September 22, 2006 when, plaintiff claims, defendant Nowicki called him to a hallway and ordered defendants Menz and Coppola to "take him down" after Lane refused to speak with Nowicki.  Complaint (Dkt. No. 1) p. 8.  As a result, plaintiff was thrown to the floor and kicked and punched, put in restraints, and placed

─────────────────

[9]     The DOCS conducts three types of inmate disciplinary hearings.  Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in a Special Housing Unit ("SHU").  Tier III hearings concern the most serious violations, and could result in unlimited keeplock or SHU confinement, with significant restrictions on access to exercise, showers, and other programs and privileges available in general prison population, and the loss of "good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S.Ct. 246 (1998).  Inmates in SHU are not completely restricted.  *Husbands v. McClellan,* 990 F. Supp. 214, 217 (W.D.N.Y. 1998); *see also* 7 N.Y.C.R.R. pt. 304.  Although Lane appears to dispute their accuracy, parole records indicate that while in prison he was accused of sixty-one Tier III infractions and forty-one Tier II violations, including harassing, threatening, lewd, unhygienic and violent conduct, resulting in a total of approximately five years in keeplock, eight years of disciplinary SHU confinement and seven months of involuntary protective custody.  Higgins Decl. (Dkt. No. 79-4) Exh. E, pp. 153-80.

on a gurney, even though he claims he did not resist.[10]  *Id.*  Plaintiff alleges

that he was denied medical treatment for the shoulder, lower back, and

face injuries that he sustained and was instead held captive in a room for

two to three days, forced to sleep on the floor, and provided only one meal

during that time period.  Complaint (Dkt. No. 1) p. 8; Tr. p. 55.

Once again, defendants' version of what occurred on that occasion is

markedly different.  Defendant Nowicki states that on September 22, 2006

plaintiff became hostile toward both staff and the residents, and threatened

to instigate a riot.  Nowicki Aff. (Dkt.  No. 79-5) ¶¶ 21-30; *see also* Higgins

Decl. (Dkt. No. 79-4) Exh. D, pp. 139-50.  Nowicki attempted to counsel

Lane in the "side room"; plaintiff rebuffed those efforts and instead

attempted to re-enter the day room.  Nowacki Aff. (Dkt.  No. 79-5) ¶¶ 23-

24.  As a result, plaintiff was placed in four point restraints, pursuant to a

doctor's orders, for a period of seven minutes and physically removed to

the side room.  *Id.* ¶ 25.  When plaintiff's threats continued, he was left in

the side room under supervision, consistent with hospital policy, from

September 22, 2006 at 1:00 p.m. until September 25 at 9:30 a.m., during

---

[10]      Plaintiff stated during his deposition that approximately twenty staff
members were present during the assault; as a result, he is unsure which defendants
actually kicked and punched him.  Tr. pp. 49-50.

which time he was provided food, a mattress and a chair.  *Id.*  ¶¶ 26-30.

When plaintiff was visited by a psychiatrist, he stated that he was upset

because he felt that he was being treated differently than other patients

with respect to unit policies, and denied any intention to hurt anyone,

despite his threats.  Higgins Decl. (Dkt. No. 79-4) Exh. D, p.150.  Detailed

CNYPC progress notes recording plaintiff's status at fifteen minute

intervals show that Lane was provided and ate all of his meals during the

time he was confined to the side room.  *Id.*  pp. 153-81.  Plaintiff's parole

officer was called to CNYPC, but found that there was insufficient evidence

to bring parole violation charges against plaintiff.  *Id.* p. 186; *see also*

Nowicki Aff. (Dkt. No. 79-5) ¶ 27 (reflecting that the parole officer was

summoned at plaintiff's request).

Following the events of September 18 and 22, 2006, plaintiff and his

wife made several written complaints and placed telephone calls to various

New York and federal agencies and officials.  Complaint (Dkt. No. 1) p. 8.

Plaintiff complains that neither he nor his wife were ever contacted by New

York State Mental Hygiene Legal Services, that Prisoners Legal Services

declined to represent him because he was no longer incarcerated, and that

defendant Beebe, the person with the New York State Commission for

11

Quality Care of Persons with Disabilities, assigned to investigate plaintiff's complaint, never visited CNYPC while Lane was there, and failed to interview plaintiff or his wife.  *Id.*  Defendants, by contrast, contend that defendant Beebe had either personal telephone conversations or exchanged voice mail messages with plaintiff's wife, Denise Lane, on October 1, October 23, November 1, November 3, and November 7, 2006. Defendants' Response to Plaintiff's Request for Admissions (Dkt. No. 62-3) ¶ 8.  Defendant Beebe also visited CNYPC on November 21, 2006 to investigate plaintiff's complaints.  Higgins Aff.  (Dkt. No. 79-4) Exh. E, pp. 32-33.

Plaintiff asserts that in early October of 2006, he was again "attacked" by another patient whom, he maintains, has a history of assaultive behavior.  Complaint (Dkt. No. 1) p. 9; Tr. p. 39.  While plaintiff admits that there was no physical contact between the two, he states that out of fear he immediately requested placement in protective custody, a request that was once again denied.  *Id.*  After the incident, plaintiff was brought to the side room and is reported to have said that the fellow patient kept threatening him, and that he would take matters into his own hands if required.  Higgins Decl. (Dkt. No. 79-4) Exh. D, p. 214.  It was noted that

CNYPC staff members were becoming increasingly concerned regarding plaintiff's menacing behavior and his apparent attempts to control and rally other patients, and that Lane stated that he felt like killing the other patient. *Id.*, pp. 214, 220.

The final incident of which plaintiff complains occurred on October 31, 2006, when Lane, upset after seeing another patient attacked, requested and was given permission to return to his room instead of remaining queued with the other patients proceeding to the dining room. Complaint (Dkt. No. 1) p. 9.  After returning to his room plaintiff was approached by defendant Lucenti regarding the incident; responding to Lucenti, Lane said, "[w]hat are you people waiting for someone to get stabbed?"  Complaint (Dkt. No. 1) p. 9.  When plaintiff left his room later that day he was confronted by defendants Nowicki, Lucenti, Menz, Coppola and Babula, at which time Nowicki allegedly stated, "[w]e got you now."  Complaint (Dkt. No. 1) p. 10.  Plaintiff appears to have interpreted this statement to mean that defendants falsified documents to make it seem that plaintiff had threatened defendant Lucenti.  *Id.;* Tr. pp. 43-44. As a result of the incident plaintiff's parole status was revoked, and he was removed that day from CNYPC and transferred into the Oneida County

Jail.  Nowicki Aff (Dkt. No. 78-2) ¶¶ 6, 19; Tr. p. 18.

According to defendants the events of October 31, 2006 were precipitated by plaintiff's refusal to stay in line and his subsequent threat, when approached regarding the incident, to put a knife to the neck of one of the CNYPC staff members.  Higgins Decl. (Dkt. No. 79-4) Exh.  D, pp. 296-301.  According to defendant Lucenti, when he went to speak with the plaintiff about getting out of line,

> Mr. Lane then got in my face, he said he was going to put a knife in a TA's [treatment assistant's] neck, a knife or something in a TA's neck.  He said I am serious, I will put a knife in one of their necks, I will lay them out cold.  You better call parole.  I'm tired of all this, I am going to the side room.

Parole Hearing Tr. (Dkt. No. 84-5) p. 32;  Higgins Decl. (Dkt. No. 79-4) Exh.  D, p. 296.  Lucenti considered this to be a serious threat.  Parole Hearing Tr. (Dkt. No. 84-5) p. 32.   Plaintiff demanded that he be moved to the side room and returned to prison, and was informed that arrangements were being made to return him to the custody of the DOCS as soon as possible; plaintiff went to the side room, his parole officer was called, a violation was issued, and Lane was returned to prison.  *Id.*

## II.   PROCEDURAL HISTORY

Plaintiff commenced this action on July 19, 2007, and was thereafter

granted leave to proceed *in forma pauperis* on August 1, 2007.  Dkt. Nos.

1, 4.  In his complaint plaintiff names ten defendants, including Sharon E.

Carpinello, the Commissioner of the OMH; Barbara Beebe,[11] a facility

review specialist from the State of New York Commission on Quality of

Care for Persons with Disabilities; Donald Sawyer, the Director of the

CNYPC; Sharon E. Barboza, M.D., the Director of the SOTP at CNYPC;

Jeffrey Nowicki, a team leader of the SOTP at CNYPC; and Anthony

Lucenti, Michael Babula, Frank Menz, Steven Coppola, and J. Crociata, all

staff members at the facility.  Alleging violations of the ADA as well as the

First, Fourth, Fifth, Eighth and Fourteenth Amendments of the United

States Constitution, plaintiff's complaint asserts ten enumerated causes of

action, including denial of due process, failure to provide reasonable

accommodations for his disability, excessive use of force, deliberate

indifference to his medical needs, failure to intervene and/or protect,

retaliation, conspiracy and failure to investigate his complaints.  *Id.*

On October 2, 2008, following joinder of issue and the close of

discovery, plaintiff moved for partial summary judgment on his due process

---

[11]    Defendant Beebe's name is incorrectly spelled as "Bebe" in the caption
and throughout plaintiff's complaint.  The court will respectfully direct the clerk to
amend the caption to reflect the correct spelling of that defendant's name.

claim as it relates to his commitment to CNYPC as well as his claims under

the ADA.  Dkt. No. 57.  In support of his motion, relying on the doctrines of

*res judicata* and collateral estoppel, plaintiff asserts that the procedures

under which he was involuntarily committed to CNYPC were determined to

be unconstitutional by the New York State Court of Appeals in *Harkavy v.*

*Consilvio*, 7 N.Y.3d 610, 825 N.Y.S.2d 702 (2006), that he was unlawfully

denied a mobility guide for his blindness, and that his parole violation was

"fruit of a poisonous tree" and would not have occurred had he not been

unlawfully detained at CNYPC in violation of the Fourth Amendment.  Dkt.

No. 57.

Defendants opposed plaintiff's motion and cross-moved for summary

judgment, advancing several grounds for rejection of all of plaintiff's claims,

including that 1) plaintiff's section 1983 claims against defendants, acting

in their official capacities, are barred by the Eleventh Amendment; 2)

plaintiff has failed to establish a valid cause of action under the ADA, and

defendants cannot be held individually liable for damages under that Act;

3) plaintiff has not established claims of failure to protect, deliberate

indifference to his medical needs, denial of access to courts, retaliation,

excessive use of force, or conspiracy; 4) plaintiff has failed to demonstrate

the requisite personal involvement by defendants Carpinello and Sawyer to

support a finding of liability against them; 5) plaintiff has no cognizable

constitutional interest in filing a criminal complaint, or in the pursuit of an

investigation regarding his complaints made while housed at CNYPC; 6)

defendants are not bound by the Court of Appeals decision in *Harkavy,*

which was decided after plaintiff was released from CNYPC, and that

decision does not create a constitutional right that is redressable in this

court; and 7) in any event, defendants are shielded from suit by the

doctrine of qualified immunity.  Dkt. No. 79-3.  Plaintiff has since

responded in opposition to defendants' motion.  Dkt. No. 84.

Both of the pending summary judgment motions, which are now ripe

for determination, have been referred to me for a report and

recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B) and Northern

District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

   A.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure.  Under that provision, summary judgment is

warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509-10).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A moving party seeking summary judgment bears the initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through

18

affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R.

Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477

U.S. at 250, 106 S. Ct. at 2511.  Where a party is proceeding *pro se*, the

court must "read [his or her] supporting papers liberally, and . . . interpret

them to raise the strongest arguments that they suggest."  *Burgos v.*

*Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  Though *pro se* plaintiffs are

entitled to special latitude when defending against summary judgment

motions, to successfully resist summary judgment they must establish

more than mere "metaphysical doubt as to the material facts."  *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348,

1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d

Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff

understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve

any ambiguities, and draw all inferences from the facts, in a light most

favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v.*

*Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary

judgment is warranted only in the event of a finding that no reasonable trier

of fact could rule in favor of the non-moving party.  *See Building Trades*

*Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").  In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop.  *See Light Sources, Inc.  v Cosmedico Light, Inc.,* 360 F.Supp.2d 432, 434 (D. Conn.  2005).

      B.      <u>Fourteenth Amendment Procedural Due Process Claim</u>

Plaintiff challenges his involuntary commitment to CNYPC as violative of his right to due process and moves for summary judgment on this claim, arguing that the New York State Court of Appeals decision in *Harkavy,* should be given *res judicata* or collateral estoppel effect in this action.  In *Harkavy*, the Court of Appeals held that the DOCS' resort to Article 9 of the MHL to institute commitment procedures for sex offenders in its custody was improper, observing that

> in the absence of a clear legislative directive in regard to inmates nearing their release from incarceration, we believe that [New York] Correction Law § 402 is the appropriate method for evaluating an inmate for postrelease involuntary commitment to a mental facility.

*Harkavy*, 7 N.Y.3d at 614.[12]  Having been committed to CNYPC under

MHL § 9.27, plaintiff now argues that *Harkavy* renders his commitment

unconstitutional, and that defendants are bound by that decision.

Defendants counter that since plaintiff was already removed from CNYPC

and returned to prison by the time *Harkavy* was decided, the case has no

bearing on his circumstances.

       1.    *Res Judicata*

Under the doctrine of *res judicata*, known also as "claim preclusion,"

a final judgment on the merits of an action precludes the parties, or those

in privity with the parties, from relitigating issues that were or could have

been raised in that action.  *Allen v. McCurry*, 449 U.S. 90, 94, 101 S. Ct.

411, 414 (1980); *Jacobson v. Fireman's Fund Insurance Co.*, 111 F.3d

---

    [12]    The Correction Law requires that the prison superintendent first apply to the court for appointment of two examining physicians and then petition the court again for a commitment order, providing a copy of the petition to the inmate, the inmate's friend or relative, and to the Mental Hygiene Legal Service.  *Harkavy*, 7 N.Y.3d at 612. The Correction Law also provides the inmate with an opportunity to request a hearing before a judge after receiving a copy of the petition but before being committed to the psychiatric hospital.  *Harkavy*, 7 N.Y.3d at 612.  In contrast, the requirements of MHL Article 9 do not necessitate that the examining physicians be appointed by the court, nor do they require either notice to the inmate or the opportunity for a hearing. *Harkavy*, 7 N.Y.3d at 612.  In the wake of *Harkavy*, on March 14, 2007, then-New York Governor Eliot Spitzer signed the Sex Offender Management and Treatment Act, which became effective on April 13, 2007, in part as Article 10 of the MHL, creating a new legal regime for committing sex offenders to mental health facilities for treatment in the SOTP.

261, 265 (2d Cir. 1997); *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir.

1994).  "It is a cardinal principle of *res judicata* that 'the first suit and the

subsequent case must involve the same cause of action[,]' otherwise, *res*

*judicata* will not bar the second action."  *Thompson v. County Franklin*, No.

92-CV-1258, 1996 WL 341988, at *3 (June 18, 1996) (McCurn, S.J.)

(quoting *Bloomquist v. Brady*, 894 F.Supp 108, 114 (W.D.N.Y. 1995)).   In

the Second Circuit, there are three separate but related factors which

together inform the analysis of the preclusive effect to be given a prior

judgment, including "[w]hether the same transaction or connected series of

transactions is at issue, whether the same evidence is needed to support

both claims, and whether the facts essential to the second were present in

the first."[13]  *Woods v. Dunlop Tire Corp.*, 972 F.2d 36, 38 (2d Cir. 1992)

---

[13]     Both the Full Faith and Credit Clause of the United States Constitution,
*see* U.S. Const. art. IV, § 1, and the corresponding Full Faith and Credit statute, 28
U.S.C. § 1738, require that a federal court accord a state court judgment the same
preclusive effect that it would merit under the law of the state from which it originated.
*See Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S. Ct. 892, 896
(1984); *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466, 102 S. Ct. 1883, 1889-90
(1982); *Burgos v. Hopkins*, 14 F.3d at 790.  This principle applies fully to claims
brought pursuant to 42 U.S.C. § 1983.  *Migra*, 465 U.S. at 84-85, 104 S. Ct. at 897-98;
*Allen v. McCurry*, 449 U.S. at 103-04, 101 S. Ct. at 419-20.  *Giakoumelos v. Coughlin*,
88 F.3d 56, 59 (2d Cir. 1996).  Since the state court determination upon which Lane
rests his *res judicata* and collateral estoppel argument originated in New York, the law
of that state controls in determining the extent of the preclusive effect of which
*Harkavy* is deserving.  *Giakoumelos*, 88 F.3d at 59; *see also Marvel Characters, Inc. v.
Simon*, 310 F.3d 280, 286 (2d Cir. 2002); *LaFleur v. Whitman*, 300 F.3d 256, 271-72
(2d Cir. 2002).  It should be noted, however, that while the law of New York, rather
than federal principles, applies to determine the preclusive effect to be given to the

(quoting *NLRB v. United Technologies*, 706 F.2d 1254, 1260 (2d Cir. 1983)
(internal quotations omitted)).

Neither Lane nor the defendants were parties to *Harkavy*.  That
lawsuit was a habeas corpus proceeding filed against the DOCS by the
New York Mental Hygiene Legal Services seeking the immediate release
of certain individuals whose prison terms had expired and were being held
at the Manhattan Psychiatric Center.  While it is arguable that defendants
in this action are in privity with the DOCS, *see Browdy v. Lantz*,
3:03CV1981, 2006 WL 2711753, at *5 (D. Conn. Sept. 21, 2006), plaintiff,
who had been released from CNYPC at the time *Harkavy* had been
decided, was not a party to that action, does not allege any privity with the
petitioners in *Harkavy*, and was never held in the Manhattan Psychiatric
Center.  Accordingly, the two actions do not arise from the same core of
operative facts, nor would they involve the same evidence.  In addition,
although both *Harkavy* and this action involve MHL § 9.27, *Harkavy* did not
determine the constitutionality of the DOCS' use of MHL § 9.27 to commit

_____

decision in *Harkavy*, this is a distinction without a difference since, as the Second
Circuit has noted, "there is no discernable difference between federal and New York
law concerning *res judicata* and collateral estoppel."  *Marvel Characters, Inc.,* 310 F.3d
at 286 (citing *Pike v. Freeman,* 266 F.3d 78, 90 n.14 (2d Cir. 2001)).

sex offenders leaving their custody.  Rather, the issue presented and
addressed by the New York Court of Appeals in that case was whether the
DOCS' use of the MHL procedure, as distinct from that set forth in
Correction Law § 402, was proper, and the court held only that it was not.
*Harkavy*, 7 N.Y.3d at 610.  For these reasons, the *Harkavy* decision does
implicate the doctrine of *res judicata* in this action.

> 2.   Collateral Estoppel

The doctrine of collateral estoppel, or claim preclusion, is equally
inapplicable in this case.  Once a court has decided an issue of fact or law
necessary to its judgment, a party to the first action, or one in privity with
the party, cannot relitigate that specific issue in a subsequent lawsuit.
*Allen*, 449 U.S. at 94; *Burgos,* 14 F.3d at 792; *Ryan v. N.Y. Telephone Co.*,
62 N.Y.2d 494, 500, 467 N.E.2d 487, 490 (1984).  Under New York law,
collateral estoppel applies only if 1) the issue in question was necessarily
decided in the prior proceeding and is decisive of the present proceeding;
and 2) the party against whom the doctrine is asserted had a full and fair
opportunity to litigate the issue in the first proceeding.  *Burgos*, 14 F.3d at
792; *Khandhar v. Elfenbein*, 943 F.2d 244, 247 (2d Cir. 1991).  The party
asserting collateral estoppel has the burden of showing that the identical

issue was previously decided, while the party opposing estoppel must

show the absence of a full and fair opportunity to litigate in the prior

proceeding.  *Burgos*, 14 F.3d at 792.  Because the issue decided in

*Harkavy* was not identical to the issue raised in this lawsuit, collateral

estoppel does not preclude litigation of the constitutionality of defendants'

actions in this case.

### 3.   Due Process

Turning to the merits of plaintiff's due process claim, I begin by noting

that to successfully state a claim under 42 U.S.C. § 1983 for denial of

procedural due process, a plaintiff must show that he or she 1) possessed

an actual liberty interest, and 2) was deprived of that interest without being

afforded sufficient procedural safeguards.  *See Tellier v. Fields*, 280 F.3d

69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes*, 143 F.3d at 658;

*Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).  It is undeniable

that [i]nvoluntary confinement, including civil commitment, constitutes a

significant deprivation of liberty, requiring due process."  *Abdul v. Matiyn v.*

*Pataki*, 9:06-CV-1503, 2008 WL 974409, at *10 (N.D.N.Y. April. 8, 2008)

(Hurd, J. and Homer, M.J.) (quoting *Fisk v. Letterman*, 401 F. Supp.2d

362, 374 (S.D.N.Y. 2005) (citations omitted).  "When a person's liberty

25

interests are implicated, due process requires at a minimum notice and an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer*, 2007 WL 4115936, at * 5 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 533, 124 S. Ct. 2633, 2648 (2004) (plurality opinion)).  The Supreme Court has approved the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public.  *Abdul*, 2008 WL 974409, at *10 (citing *Kansas v. Hendricks*, 521 U.S. 346, 371, 117 S. Ct. 2072, 2086 (1997)).

    Plaintiff was committed to CNYPC by way of the procedures set out in MHL § 9.27, rather than Correction Law § 402.  Lane was not afforded notice and an opportunity to be heard before, or even after, his transfer to that facility.  In light of these facts, and for the reasons underpinning the Court of Appeals' decision in *Harkavy*, it appears that plaintiff's due process rights were violated in connection with his commitment.  *Abdul*, 2008 WL 974409, at *10; *see also Wheeler v. Pataki*, No. 9:07-CV-0892, 2009 WL 674152, at *6-7 (N.D.N.Y. March 11, 2009) (McAvoy, S.J. and Lowe, M.J.).  I therefore recommend denial of defendants' motion for summary judgment dismissing plaintiff's due process claim to the extent

26

that defendants' basis for dismissal is addressed to the merits of that

cause of action.[14]

### 4.    "Fruit of the Poisonous Tree"

In an apparent effort to make a claim for violation of his Fourth

Amendment rights, plaintiff next argues that if he had not been committed

to CNYPC under the MHL, he would not have been "illegally" confined and

therefore would not have threatened defendant Lucenti and violated his

parole.   In a creative attempt to draw upon principles that do not translate

well into this setting, Lane argues that the conduct giving rise to his parole

revocation is "tainted" under the "fruit of the poisonous tree" principles.

"The fruit of the poisonous tree doctrine excludes evidence obtained

from or as a consequence of lawless official acts."   *Townes v. City of New*

*York*, 176 F.3d 138, 145 (2d Cir. 1999) (quoting *Costello v. United States*,

---

[14]    It is worth noting that the only named defendant who was even remotely involved in plaintiff's civil commitment was defendant Sawyer, to the extent that he signed the certification of service of a "Notice of Application for Court Authorization to Retain a Patient" on October 26, 2006, forty-four days after plaintiff was committed to CNYPC.  *See* Higgins Decl. (Dkt 79-4) Exh. D, p. 391.  Plaintiff has not named as defendants in this action any prison official who was involved in his commitment under the MHL.  Because I ultimately recommend that such a claim against prison officials would be subject to dismissal based upon qualified immunity, I find that any attempt by plaintiff to amend his complaint to name such defendants would not cure this fatal substantive defect, and would therefore be futile.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

365 U.S. 265, 280, 81 S. Ct. 534, 542 (1961)).  It does not apply in this

context where plaintiff apparently objects to use of evidence of his threats

as a basis for a parole violation.  *See Rabb v. McMaher*, No. 94-CV-614,

1998 WL 214425, at *7 (N.D.N.Y. Apr. 24, 1998) (Pooler, J.) ("This doctrine

applies to evidence that is obtained during a criminal investigation as a

result of an unconstitutional search; it does not apply to to prison

disciplinary hearings.").  Simply stated, the fruit of the poisonous tree

doctrine cannot link the conduct allegedly violating plaintiff's Fourth

Amendment rights to his return to prison and establish an actionable claim,

since this evidentiary doctrine is inapplicable in a civil section 1983 setting.

*Townes*, 176 F.3d at145.

    C.   <u>Qualified Immunity</u>

As one of the bases for their summary judgment motion, defendants

assert their entitlement to qualified immunity from suit.  Qualified immunity

shields government officials performing discretionary functions from liability

for damages "insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have

known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738

(1982) (citations omitted).  Accordingly, governmental officials sued for

damages "are entitled to qualified immunity if 1) their actions did not violate

clearly established law, or 2) it was objectively reasonable for them to

believe that their actions did not violate such law."  *Warren v. Keane*, 196

F.3d 330, 332 (2d Cir. 1999) (citing *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir.

1996)); *see also Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007);

*Iqbal v. Hasty*, 490 F.3d 143,152 (2d Cir. 2007), *rev'd on other grounds,*

*sub. nom. Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937 (May 18, 2009).

The law of qualified immunity seeks to strike a balance between

overexposure by government officials to suits for violations based upon

abstract rights and an unduly narrow view which would insulate them from

liability in connection with virtually all discretionary decisions.  *Locurto v.*

*Safir*, 264 F.3d 154, 162-63 (2d Cir. 2001); *Warren,* 196 F.3d at 332.  As

the Second Circuit has observed,

> [q]ualified immunity serves important interests in our
> political system, chief among them to ensure that
> damages suits do not unduly inhibit officials in the
> discharge of their duties by saddling individual officers
> with personal monetary liability and harassing litigation.

*Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001) (internal

quotations omitted) (citing, *inter alia*, *Bivens v. Six Unknown Named*

*Agents of the Fed. Bureau of Narcotics*, 456 F.2d 1339, 1348 (2d Cir.

1972)).

Until recently, it was generally agreed that a proper qualified immunity analysis entailed a three step inquiry. *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211-12 (2d Cir. 2003). As a threshold matter a court considering the issue was charged with first determining whether, based upon the facts alleged, the plaintiff had facially established a constitutional violation. *Id.*; *Gilles v. Repicky*, 511 F.3d 239, 243-44 (2d Cir. 2007). If the answer to this inquiry was in the affirmative, then the focus turned to whether the right in issue was clearly established at the time of the alleged violation. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 201-02, 121 S. Ct. 2151, 2156 (2001)); *see also Poe v. Leonard*, 282 F.3d 123, 132-33 (2d Cir. 2002). Finally, upon determining that the plaintiff had a clearly established, constitutionally protected right which was violated, the court next considered whether it was nonetheless objectively reasonable for the defendant to believe that his or her action did not abridge that established right. *Harhay*, 323 F.3d at 211; *Poe*, 282 F.3d at 133 (quoting *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998) (quoting, in turn, *Salim*, 93 F.3d at 89)).

The United States Supreme Court recently had the opportunity to

30

reconsider the analysis prescribed by *Saucier*, holding that while the

sequence of the inquiry set forth in that case is often appropriate, it should

no longer be regarded as compulsory.  *Pearson v. Callahan*, 555 U.S. ___,

129 S. Ct. 808, 820 (Jan. 21, 2009).  In *Pearson*, the Court reasoned that

while the *Saucier* protocol promotes the development of constitutional

precedent and is "especially valuable with respect to questions that do not

frequently arise in cases in which a qualified immunity defense is

unavailable," the rigidity of the rule comes with a price.  *Id.* at 818.  The

inquiry often wastes both scarce judicial and party resources on

challenging questions that have no bearing on the outcome of the case.

*Id.*  Given that the purpose of the qualified immunity doctrine is to ensure

that insubstantial claims are resolved prior to discovery, the Court opined

that the algorithm prescribed by *Saucier* may serve to defeat this goal by

requiring the parties "to endure additional burdens of suit – such as the

cost of litigating constitutional questions and delays attributable to

resolving them – when the suit otherwise could be disposed of more

readily."  *Id*. (quotations and citations omitted).

　　As a result of its reflection on the matter, the *Pearson* Court

concluded that because "the judges of the district courts and courts of

31

appeals are in the best position to determine the order of decision making

[that] will best facilitate the fair and efficient disposition of each case",

those decision makers "should be permitted to exercise their sound

discretion in deciding which of the... prongs of the qualified immunity

analysis should be addressed first in light of the circumstances of the

particular case at hand." *Id.* at 818, 821.  In other words, as recently

emphasized by the Second Circuit, the courts "are no longer *required* to

make a 'threshold inquiry' as to the violation of a constitutional right in a

qualified immunity context, but we are free to do so."  *Kelsey v. County of

Schoharie*, 567 F.3d 54, 61 (2d Cir. 2009) (citing *Pearson*, 129 S. Ct. at

821) (emphasis in original).  "The [*Saucier* two-step] inquiry is said to be

appropriate in those cases where 'discussion of why the relevant facts do

not violate clearly established law may make it apparent that in fact the

relevant facts do not make out a constitutional violation at all.'" *Id.* (quoting

*Pearson*, 129 S. Ct. at 818).

The question is whether "upon viewing the allegations of the

complaint in the light most favorable to the plaintiff and drawing all

inferences favorable to the plaintiff, [a] reasonable jury *could* conclude that

it was objectively unreasonable for the defendants to believe that they were

acting in a fashion that did *not* violate an established federally protected right," in which case the motion to dismiss must be denied. *Quartararo v. Catterson*, 917 F. Supp. 919, 959 (E.D.N.Y 1996) (quoting *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d. Cir. 1993); *see also Schwartz v. Dennison*, 518 F.Supp.2d 560, 571 (S.D.N.Y. 2007), *aff'd* 2009 WL 2172510 (2d Cir. July 22, 2009).

Although I have determined that plaintiff's right to due process was violated when he was involuntarily committed to CNYPC, I also find that the inability of state officials, including defendants and any DOCS official that may have been involved, to rely on MHL § 9.27 was not clearly established at that time. At the time of plaintiff's commitment the Court of Appeals had not yet decided *Harkavy*. Indeed, before plaintiff's commitment, the New York State Supreme Court Appellate Division, First Department, in that case had endorsed the DOCS' ability to utilize MHL § 9.27, finding that provision to be consonant with the petitioners' Fourteenth Amendment rights to due process. *Harkavy v. Consilvio*, 29 A.D.3d 221, 812 N.Y.S.2d 496 (1st Dep't 2006). In addition to the unsettled state of the law in New York, it appears that no federal court decision had been issued forecasting the ultimate finding in *Harkavy* before plaintiff's confinement to

33

CNYPC.  In fact, prior to *Harkavy*, the Second Circuit had generally approved of MHL § 9.27 as meeting both substantive and procedural due process requirements.  *See, e.g., Project Release v. Provost*, 722 F.2d 950, 972-975 (2d Cir. 1983).  Accordingly, I conclude that the parameters of plaintiff's constitutional right to due process were not clearly established at the time of his commitment and that, as a matter of law, it was objectively reasonable for defendants, as well as the DOCS, to rely on MHL § 9.27 in committing plaintiff to CNYPC.  I therefore recommend a finding that, to the extent that any of the defendants were involved in the decision to commit plaintiff to CNYPC on his parole release date, they are entitled to qualified immunity with respect to plaintiff's claims for violation of his Fourteenth Amendment rights to due process, in light of the fact that it was objectively reasonable for them to believe that they were acting in a manner that did not violate any of plaintiff's protected rights.

> D.    Eleventh Amendment

Although not specifically stated, plaintiff's claims in this action appear to be asserted against defendants both individually and in their official capacities as state employees.  Complaint (Dkt. No. 1) ¶ 3.  Defendants contend that plaintiff's claims against them in their official capacities are

subject to dismissal on the basis of the immunity that the Eleventh
Amendment affords.

The Eleventh Amendment protects a state against suits brought in
federal court by citizens of that state, regardless of the nature of the relief
sought. *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58
(1978). This absolute immunity, which states enjoy under the Eleventh
Amendment, extends both to state agencies and in favor of state officials
sued for damages in their official capacities when the essence of the claim
involved seeks recovery from the state as the real party in interest.[15]
*Richards v. State of New York Appellate Div., Second Dep't*, 597 F. Supp.
689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White*, 457 U.S. 85, 89-
91, 102 S. Ct. 2325, 2328-29 (1982)). To the extent that a state official is
sued for damages in his official capacity the official is entitled to invoke the
Eleventh Amendment immunity belonging to the state. *See Kentucky v.
Graham*, 473 U.S. 159, 169, 105 S. Ct. 3099, 3105 (1985); *Hafer v. Melo*,
502 U.S. 21, 26, 112 S. Ct. 358, 361 (1991). Eleventh Amendment

---

[15]   In a broader sense, this portion of defendants' motion implicates the
sovereign immunity enjoyed by the state. As the Supreme Court has reaffirmed
relatively recently, the sovereign immunity enjoyed by the states is deeply rooted,
having been recognized in this country even prior to ratification of the Constitution, and
is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co.
of New York v. Chatham County*, 547 U.S. 189, 193, 126 S. Ct. 1689, 1693 (2006).

immunity does not extend, however, to employees who are sued in their personal or individual capacity. *Schwartz,* 518 F. Supp. 2d at 570 (citing *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988)).

Since plaintiff's damage claims against the named defendants in their official capacities are in reality claims against the State of New York, thus exemplifying those against which the Eleventh Amendment protects, they are subject to dismissal. *Daisernia v. State of New York*, 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.). I therefore recommend that this portion of defendants' motion be granted, in part, and that all damage claims, except for those asserted against the defendants in their official capacities under the ADA, be dismissed.[16]

E.   Failure to Provide Reasonable Accommodations Under the ADA

Plaintiff asserts that defendants knew, or should have known, that he is legally blind and that their refusal to provide him with reasonable accommodations for this alleged disability was in contravention of the ADA. Lane now moves for summary judgment in his favor on this claim, apparently on the grounds that his legal blindness constitutes a disability

---

[16]   As will be seen, defendants' Eleventh Amendment argument relating to plaintiff's claims under the ADA against defendants in their official capacities are not so easily discounted. *See* pp. 38-43, *post.*

as a matter of law and that he has sufficiently demonstrated defendants'

denial of reasonable accommodation for this disability.  Defendants

respond that they are entitled to dismissal of this claim because plaintiff

has failed to allege that his legal blindness substantially limits a major life

activity and also has failed to prove that he was excluded from participation

in, or denied benefits of, some service or program.  Defendants argue

further that the taking of plaintiff's cane was not motivated by

discriminatory animus.  Finally, defendants contend that plaintiffs' claims

against them in their individual capacities are not permitted under the ADA

and damages against them in their official capacities are barred by the

Eleventh Amendment.

> The ADA provides that

> no qualified individual with a disability shall, by reason of such
> disability, be excluded from participation in or be denied the benefits
> of the services, programs, or activities of a public entity, or be
> subjected to discrimination by any such entity.

42 U.S.C. § 12132 (1990).  CNYPC, operated by the New York OMH, is

considered a public entity for the purposes of the ADA, and as such is

required to provide "reasonable modifications to rules, policies, or

practices..." S*ee* 42 U.S.C.A. § 12131(1)(B) & 42 U.S.C.A. § 12131(2).

Public entities are not required to provide substantively different services to

the disabled under the disability statutes, but instead must provide

"'reasonable accommodations' to enable 'meaningful access' to such

services as may be provided, whether such services are adequate or not."

*Wright v. Giuliani*, 230 F.3d 543, 548 (2d Cir. 2000).

It is well established that under the ADA, suits against defendants in

their individual capacities as state officials are barred.  *Garcia v. S.U.N.Y.*

*Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001)

(collecting cases).  Accordingly, I recommend dismissal of plaintiff's ADA

claim to the extent that it seeks recovery of damages against defendants

as individuals.  The issue of whether defendants are immune in their

official capacities is significantly more complicated.

1.   Eleventh Amendment: ADA Claims

In *Henrietta D. v. Bloomberg*, the Second Circuit held that under *Ex*

*Parte Young* an ADA plaintiff can assert a prospective claim for injunctive

relief against a state official in his or her official capacity, as opposed to

against the state directly.  331 F.3d 261, 287 (2d Cir. 2003), *cert denied.*,

541 U.S. 936 (2004) (citing *Ex Parte Young*, 209 U.S. 123, 155-56, 28 S.

Ct.  441, 452 (1908)).  That court has not explicitly held likewise for ADA

plaintiffs who seek money damages.  Nonetheless, a request for monetary

damages from state officials in their official capacities is the functional

equivalent of a claim for damages directly from the State of New York, and

Eleventh Amendment sovereign immunity therefore ordinarily protects a

defendant in his or her official capacity to the same extent that it protects

the State.  *See*, *e.g.*, *Garcia,* 280 F.3d at 107 (citing *inter alia*, *Will v. Mich.*

*Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312 (1989)).

It is well settled under Eleventh Amendment jurisprudence that

neither a state nor one of its agencies can be sued without either express

or implied consent, or an express abrogation by Congress of the state's

sovereign immunity.  *See*, *e.g.*, *Kilcullen v. N.Y. State Dep't of Labor*, 205

F.3d 77, 79 (2d Cir. 2000), *implicitly overruled on other grounds by Bd. of*

*Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 368, 121 S. Ct. 955, 965

(2001); *Hallett v. N.Y. State DOCS*, 109 F. Supp.2d 190, 197 (S.D.N.Y.

2000) (citations omitted).  In this respect, the Eleventh Amendment, while

not directly controlling, confirms the broader, "'background principle of

sovereign immunity[.]'"  *Garcia*, 280 F.3d at 107 (quoting *Seminole Tribe of*

*Fla. v. Florida*, 517 U.S. 44, 72, 116 S. Ct. 1114, 1131 (1996)).  When

39

abrogating sovereign immunity, Congress must both unequivocally intend

to do so and act pursuant to a valid grant of constitutional authority.

*Garrett*, 531 U.S. at 363, 121 S. Ct. at 962 (citing, *inter alia*, *Seminole*

*Tribe*, 517 U.S. at 54, 116 S. Ct. at 1122); *Garcia*, 280 F.3d at 108

(citations omitted).  The pivotal question, in determining whether

defendants are entitled to protection under the Eleventh Amendment when

sued in their official capacities, is whether, and if so to what extent, that

amendment protects the states from liability under Title II of the ADA.[17]

The question of whether the Eleventh Amendment bars ADA claims

under Title II against a state is an unsettled question among the circuits.  In

*Garrett*, the Supreme Court held that Congress had failed to validly

abrogate state sovereign immunity under Title I of the ADA.  531 U.S. at

374, 121 S. Ct. at 967-68.  In doing so, the Court was careful to distinguish

Title II from its analysis, inasmuch as the issue had not been briefed by the

parties, but did note that the remedial scheme of Title II is very different

from that of Title I.  *Id.* at 360 n.1, 121 S. Ct. at 960 n.1.  The courts appear

to be divided as to whether *Garrett* should extend to Title II of the ADA,

---

[17]     In making my analysis I have assumed, without deciding, that plaintiff's
failure to include the state the OMH, and/or the CNYPC as a named defendant is not
fatal to his claims.

especially since *Pennsylvania Dep't of Corr. v. Yeskey* – which held that

Title II of the ADA applies to prisons – had been decided in the term

previous to *Garrett*, but did not address sovereign immunity.  524 U.S. 206,

118 S. Ct. 1952 (1998); *compare, e.g.*, *Popovich v. Cuyahoga Cty. Ct. of

Common Pleas*, 276 F.3d 808, 813-16 (6th Cir. 2002) (holding that

sovereign immunity validly abrogated by Congress as to the Due Process

Clause), *cert. denied*, 537 U.S. 812, 123 S. Ct. 72 (2002), with *Alsbrook v.

City of Manuelle*, 184 F.3d 999, 1007 (8th Cir. 1999), *cert. dismissed* 529

U.S. 1001 (2000) (finding that Congress exceeded authority by extending

Title II of the ADA to the states and therefore did not validly abrogate

sovereign immunity).

     The Second Circuit has taken a slightly different approach than

various other federal courts in addressing this question.  In *Muller v.

Costello*, decided before the Supreme Court issued its opinion in *Garrett*,

the Second Circuit found that Congress had validly abrogated sovereign

immunity within its authority under section five of the Fourteenth

Amendment, subjecting states to potential monetary liability under the

ADA.[18]  187 F.3d 298, 310 (2d Cir. 1999).  More recently, however, in

*Garcia v. S.U.N.Y. Health Sciences Ctr.,* the Second Circuit found that

*Garrett* had "implicitly abrogated" its prior position that the states were not

immune from ADA claims.  280 F.3d at 113 n.3.

In *Garcia*, the Second Circuit found that Congress could not validly

abrogate sovereign immunity under the Commerce Clause, one of the two

empowering provisions cited in support of its enactment of Title II.  *Garcia*,

280 F.3d at 108.  The circuit court went on to find, however, that Congress

could exercise its authority under section five of the Fourteenth

Amendment – the "sweep of congressional authority" allowing Congress to

"enforce the [F]ourteenth [A]mendment and to regulate commerce, in order

to address the major areas of discrimination faced day-to-day by people

with disabilities" – when enacting Title II of the ADA, as a whole, though it

found the power to have been exceeded through enactment of Title II,

since that provision conferred upon Congress the right to abrogate

sovereign immunity and allow for private parties to sue non-consenting

states for money damages.  *Garcia*, 280 F.3d at 108-10.

---

[18]     That section provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article."  U.S. Const. amend XIV, § 5.

Turning to the specific question of whether Congress, through proper invocation of its section five powers, effectively abrogated sovereign immunity in the case of private damage suits under Title II, however, the Second Circuit found that the ADA's broad remedial scheme, borrowed from the Rehabilitation Act and Title VI of the Civil Rights Act of 1964, included a judicially implied private cause of action, thus allowing that court latitude to shape a remedy. *Id.* at 110-112. Specifically, in *Garcia* the Second Circuit concluded that Title II claims against the states for monetary damages and injunctive relief could be reconciled with the prohibitions of the Eleventh Amendment if permitted in limited circumstances – that is, in cases where a plaintiff establishes that a Title II violation was motivated by discriminatory animus or ill will based on disability. *Garcia*, 280 F.3d at 111; *see Doe v. Goord*, No. 04-CV-0570, 2004 WL 2829876, at *15 (S.D.N.Y. Dec. 10, 2004); *Lighthall v. Vadlamudi*, No. 9:04-CV-0721, 2006 WL 721568, at *18 (N.D.N.Y. Mar. 17, 2006) (Mordue, C.J.). In other words, defendants' conduct must be "based on irrational prejudice or wholly lacking a legitimate government interest." *Garcia*, 280 F.3d at 111. Since I find defendants' are not immune from suit

43

under the Eleventh Amendment  in their official capacities for alleged

violations of the ADA, it is necessary to evaluate the merits of plaintiff's

claim under that provision.

2.     *McDonnell Douglas* Analysis

The court in *Garcia* conceded that it may be a difficult burden for a

plaintiff to establish that an ADA violation resulted from discrimination, or ill

will, and held that a plaintiff can rely on the *McDonnell Douglas* burden-

shifting technique, or a motivating factor analysis under *Price Waterhouse*,

to establish such a claim.  *Garcia*, 280 F.3d at 112.

Under the *McDonnell Douglas* protocol, a plaintiff must first establish

a *prima facie* case of discrimination.  *McDonnell Douglas Corp. v. Green,*

411 U.S. 792, 802-03, 93 S. Ct. 1817, 1824 (1973); *Holtz v. Rockefeller &*

*Co., Inc.,* 258 F.3d 62, 76 (2d Cir. 2001) (citing *Reeves v. Sanderson*

*Plumbing Prods. Inc.*, 530 U.S. 133, 142, 120 S. Ct. 2097, 2106 (2000)).

Upon establishment of a *prima facie* case, the burden of production shifts

to the defendant, who at that juncture must come forward and articulate a

legitimate, non-discriminatory reason for the adverse action in issue.

*McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S. Ct. 1817; *Holtz,* 258 F.3d

44

at 77 (quoting *James v. New York Racing Ass'n,* 233 F.3d 149, 154 (2d

Cir. 2000)); *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003).  Once the

defendant has successfully shouldered this burden, the focus then reverts

to the plaintiff, who must establish that the alleged, non-discriminatory

rationale offered did not genuinely prompt the adverse action, but instead

is a mere pretext for discrimination.  *McDonnell Douglas Corp.*, 411 U.S. at

804, 93 S. Ct. 1817; *Graham v. Long Island R.R.,* 230 F.3d 34, 43 (2d Cir.

2000) (citing *Hargett v. Nat'l Westminster Bank, USA,* 78 F.3d 836, 839 (2d

Cir. 1996), *cert denied*, 519 U.S. 824, 117 S. Ct. 84 (1996)).  While under

the *McDonnell Douglas* paradigm the burden of production alternates back

and forth between the parties, a plaintiff claiming intentional discrimination

is tasked ultimately with establishing discrimination by a preponderance of

the evidence.  *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248,

253, 101 S. Ct. 1089, 1093 (1981); *Holcomb v. Iona College,* 521 F.3d

130, 138 (2d Cir. 2008).

       Under *Price Waterhouse*, if the plaintiff can establish that the

prohibited discrimination played "a motivating part" in the adverse action,

the defendant must then demonstrate that he or she "would have made the

45

same decision in the absence of discrimination."  *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252-53, 109 S. Ct. 1775, 1792 (1989).  A party seeking the benefit of this defense bears the burden of establishing by a preponderance of the evidence that it would have taken the same action, irrespective of the plaintiff's disability.  *See Bookman v. Merrill Lynch*, No. 02 CIV. 1108, 2009 WL 1360673, at *10-16 (S.D.N.Y. May 14, 2009).

To state a valid violation of the ADA, a plaintiff must show "1) [he is a] 'qualified [individual]' with a disability; 2) that the defendants are subject to the ADA; and 3) that [plaintiff was] denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or were otherwise discriminated against by defendants, by reason of plaintiff's disabilities."  *Henrietta D. v. Bloomberg*, 331 F.3d at 272 (citing *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998)).

### a.    Plaintiff's Disability

A person is considered to have a disability if he or she has "a) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; B) a record of such an impairment; or C) [is] regarded as having such impairment."  42 U.S.C. § 12102(2).  Major

46

life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working."  42 U.S.C. § 12102(2)(A).

In support of his motion, plaintiff has presented evidence of an eye examination performed on July 22, 2005, while Lane was incarcerated at Sullivan Correctional Facility, diagnosing him as having a prosthesis of the left eye and glaucoma and increasing myopia in the right eye.  Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57-4) Exh. B.  Defendants admit their awareness of plaintiff's sight limitations, though they question his allegations regarding the severity of the vision impairment of his right eye.  Notably, in and of itself, "monocular vision" is not a *per se* disability within the meaning of the ADA.  *Hoehn v. Int'l Sec. Services & Investigations, Inc.,* 244 F.Supp.2d 159, 167 (W.D.N.Y. 2002) (citing *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 556, 119 S. Ct. 2162, 2169 (1999).  "[R]ather, whether monocular vision substantially limits a major life activity of a particular individual is to be determined on a case by case basis and in terms of the impairment's impact on the individual."  *Id.*; *see*

47

*also Ditullio v. Village of Massena*, 81 F.Supp.2d 397, 405 (N.D.N.Y. 2000).  To determine the particular impact of monocular vision upon a plaintiff, for purposes of the ADA disability calculus, the court should consider "1) the degree of visual acuity in the weaker eye; 2) the age at which the vision loss occurred; 3) the extent of the individual's compensating adjustments in visual techniques; and, 4) the ultimate scope of the restrictions on the individual's abilities."  *Hoehn,* 244 F.Supp.2d at 167 (citing *Kirkingburg*, 527 U.S. at 566, 119 S. Ct. at 2169).  Even though most people with monocular vision will meet the ADA's definition of disability, they are still required to prove their loss is substantial.  *Id.*; *see also, Gibbs v. City of New York*, No. 02-CV-2424-LB, 2005 WL 497796, at *5 (S.D.N.Y. Jan. 21, 2005).  Moreover, the fact that one can be characterized as "legally blind" does not, as a matter of law, establish a disability within the meaning of the ADA.  *See Rivera v. Apple Indus. Corp*., 148 F.Supp.2d 202, 207, 213 (E.D.N.Y. 2001); *Hoehn*, 244 F.Supp. 2d at 162, 171; *EEOC v. United Parcel Serv., Inc.*, 306 F.3d 794, 799, 803 (9th Cir. 2002).

Plaintiff has failed to come forward with sufficient evidence to

48

establish that he is disabled as a matter of law.  While plaintiff states that,

in addition to a left eye prosthesis, he has glaucoma and increasing

myopia of the right eye, the evidence as to the actual restrictions that he

suffers and whether such restrictions affect a major life activity is

equivocal, at best.  Plaintiff contends that he is unable to read without the

use of a magnifier and cannot participate in recreation without sports

goggles and ankle braces.  Defendants, on the other hand, assert that

while housed at CNYPC, plaintiff demonstrated no signs of difficulty

relating to his ability to write, read, or use a calculator without any

supplemental aids or services, and that he was able to fully participate in

his treatment programs.  Affording defendants the benefit of all inferences,

it appears that material questions of fact exist as to whether plaintiff is

disabled within the meaning of the ADA, thus precluding the entry of

summary judgment in his favor on the ADA cause of action set forth in his

complaint.

b.    Plaintiff's Participation

Even assuming that plaintiff sufficiently established that he suffers

from a cognizable disability, his motion for summary judgment on his ADA

claim nonetheless must fail.  Plaintiff easily satisfies the second applicable

requirement; since CNYPC and OMH are agencies of the State,

defendants are required to adhere to the ADA.  *See* 42 U.S.C. §

12131(1)(B).  The third prong of the ADA analysis, however, entails

analysis of whether Lane was denied the opportunity to participate in

services, programs, or activities as a result of his alleged disability; again,

this issue presents questions of fact not susceptible to resolution on the

motion for summary judgment.  Plaintiff argues that as a result of not

receiving reasonable accommodations, he was unable to participate in

recreation without his requested sport goggles and ankle braces, and he

was unable to read until his family provided him with a magnifier.  Tr. p. 62-

63.  Plaintiff also claims that after his mobility cane was taken upon

admittance to CNYPC, he was never offered another means of assistance

and instead was told to by defendant Coppola to "crawl or feel his way".

Lane Aff. (Dkt. No. 84-2) ¶ 6.  In contrast, defendants contend that

throughout plaintiff's stay at CNYPC, he demonstrated no signs of difficulty

in his ability to write, read, or use a calculator without any supplemental

aids or services and that he was able to fully participate in his treatment

groups.  Nowicki Aff. (Dkt. No. 79-5) ¶¶ 11, 12, 14.  From these competing

claims, it is readily apparent that questions of fact preclude a finding in

favor of plaintiff on the issue of whether he was denied reasonable

accommodations.

c.    <u>Discriminatory Animus</u>

If the plaintiff is able to establish a *prima facie* claim under the ADA

at trial, the burden will shift to defendants to come forward with a legitimate

non-discriminatory reason for their conduct.  While denying their

awareness that plaintiff required accommodations for his visual

impairment, defendant Nowicki asserts that upon being admitted to

CNYPC, plaintiff's mobility cane was confiscated for safety and security

purposes, and that plaintiff was immediately offered a wheelchair or walker,

both of which he refused. Nowicki Aff. (Dkt. No. 79-5) ¶¶ 7-8.  Defendants

contend further that plaintiff's records did not indicate that he experienced

mobility problems, and that he indicated that he could read and write, a fact

that became evident to them as result of Lane's active participation in the

program.  *Id*. at ¶¶ 9-12.

Defendants have thus articulated legitimate non-discriminatory

51

reasons for their actions.  In response, plaintiff has neither offered

evidence of pretext, nor has he produced evidence of discriminatory

animus.  Indeed, plaintiff's complaint is devoid of any allegation that

defendants actions were motivated by irrational discriminatory animus or ill

will based upon his visual impairment, and Lane has produced no evidence

that would support such a claim.  *See Garcia*, 280 F.3d at 112.

In view of the foregoing, I recommend denial of plaintiff's motion for

summary judgment on his ADA claim.  And, based upon plaintiff's failure to

produce any evidence of discriminatory animus, I further recommend that

defendants' motion for summary judgment dismissing plaintiff's ADA claim

against defendants in their official capacities be granted.

F.    Fourteenth Amendment Substantive Due Process Claims

Several claims alleged in plaintiff's complaint are predicated upon

alleged violations of the Eighth Amendment, although plaintiff also makes

reference to the Fourteenth Amendment throughout his complaint.  When

plaintiff was released by the DOCS to CNYPC, he had served his prison

term, subject to release on parole, and was no longer a prison inmate.  The

Eighth Amendment, prohibiting cruel and unusual punishment of those

convicted of crimes, is therefore not applicable under the circumstances. *Youngberg v. Romeo*, 457 U.S. 307, 312, 102 S. Ct. 2452, 2456 (1982). Because plaintiff was not a prison inmate at the time of the alleged deprivation of his federal rights, any claim arising from his confinement must be asserted and evaluated under the Due Process Clause of the Fourteenth Amendment. *Dove v. City of New York*, No. 03-CV-5052, 2007 WL 805786, at * 7 (S.D.N.Y.  March 15, 2007) (citing cases).

Patients who are involuntarily committed unquestionably are entitled to certain rights under the Fourteenth Amendment; as the Supreme Court has noted, "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed . . . in unsafe conditions."  *Youngberg*, 457 U.S. at 315-16, 102 S. Ct. at 2458.  "The Supreme Court has explained that 'when the State takes a person into its custody and holds [her] there against [her] will, the Constitution imposes upon it a corresponding duty to assume responsibility for [her] safety and general well-being.'"  *Beck v. Wilson*, 377 F.3d 884, 889 (8th Cir. 2004) (quoting *DeShaney v. Winnebago Couty Dep't of Soc. Servs.,* 489 U.S. 189, 199-200, 109 S.Ct. 998 (1989)).

Plaintiff's claims of failure to protect, excessive force, and medical indifference, all framed as arising under the Eighth Amendment, relate to allegedly unsafe conditions while he was involuntarily confined at CNYPC, and must be analyzed within the framework of the Fourteenth Amendment.

          1.   <u>Failure to Protect</u>

The Second Circuit has yet to address the correct standard to be applied when evaluating a failure to protect claim arising out of an involuntary commitment, and there appears to be some uncertainty regarding the matter.  The Supreme Court "established [in *Youngberg*] that involuntarily committed mental patients have substantive due process rights, . . . [and] . . . held that only an official's decision that was a 'substantial departure from accepted professional judgment, practice or standards' would support a substantive due process claim brought by an involuntarily committed mental patient."  *Vallen v. Carrol*, No. 02 Civ. 5666(PKC), 2005 WL 2296620, at * 8 (S.D.N.Y. Sept. 20, 2005) (quoting *Youngberg*, 457 U.S. at 323).  In *Vallen*, the court examined *Youngberg* and whether the substantial departure standard evolving from that decision should be applied where the plaintiff, who was a patient involuntarily

54

committed to the Mid-Hudson Forensic Psychiatric Facility, alleged that he

was subjected to violence and that the defendants, security hospital

treatment assistants, failed to prevent those incidents.  Distinguishing

*Youngberg*, the court stated that

> [u]nlike the defendants in *Youngberg,* the defendants here are
> low-level staff members.  The nature of such an employee
> immediately addressing patient-on-patient assault or theft
> differs significantly from higher-level decisions like patient
> placement and the adequacy of supervision.  For the latter
> decisions, it is readily possible to apply a test based on
> professional judgment, practice or standards.  In this case,
> professionals made none of the challenged decisions, and thus
> the "substantial departure" test has no applicability.

*Vallen*, 2005 WL 2296620, at *8.  The court went on to acknowledge that

the general approach to substantive due process claims asserted under

section 1983 requires that a plaintiff show that the defendants' actions,

taken under color of state law, involved "conduct intended to injure

[plaintiff] in some way unjustified by [any] . . . governmental interest and

most likely rise to the conscience-shocking level".  *Id.* (quoting *County of

Sacramento v. Lewis*, 523 U.S. 833, 849, 118 S. Ct. 1708, 1718 (1998)).

Ultimately, however, the court suggested that this test would result in an

unduly heavy burden being placed upon a plaintiff and also would be

inconsistent with the state's central role in supervising and caring for the

involuntarily committed.  *Vallen*, 2005 WL 2296620, at *9.   Instead, citing

*Lewis* and analogizing the plaintiff's rights to those of pre-trial detainees,

the court suggested its agreement with the "deliberate indifference"

standard employed in such circumstances by the Eighth Circuit.  *Id.* at *9

(citing *Moore v. Briggs*, 381 F.3d 771, 773 (8th Cir. 2004)).[19]

In *Dove v. City of New York*, a claim similar to that raised by Lane

was interposed by the plaintiff, another involuntarily committed individual,

arising out of altercations with other patients.  Rejecting the applicability of

the Eighth Amendment to the plaintiff's circumstances, the court likewise

acknowledged the lack of certainty as to whether the claim against the

defendants should be measured by a "substantial departure" or "deliberate

indifference" standard.  *Dove,* 2007 WL 805786, at *8.  Citing *Vallen*, the

court failed to reach the issue of which standard would apply, finding that

under either no reasonable factfinder could conclude that defendants

violated plaintiff's constitutional rights.  *Id.*

I tend to agree with the *Vallen* court's conclusion that the "standard

_____

[19]      While the court stated that it was "inclined to agree with the Eighth
Circuit," it did not resolve the issue of the appropriate standard to be applied, finding in
that case that "whether the defendants' actions are measured under the 'conscience
shocking,' the 'substantial departure' or the 'deliberate indifference' standard, the result
is the same . . .."  *Vallen*, 2005 WL 2296620, at * 9.

of 'deliberate indifference'" best accommodates constitutional concerns in connection with section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them in violation of their substantive due process rights.[20]  *Vallen*, 2005 WL 2296620, at * 9.

---

[20]     Though endorsing *Vallen*, I respectfully disagree, to some extent, with the court's reasoning in that case.  At its core the concept of due process is intended to protect against the arbitrary exercise of the powers of government. *Lewis*, 523 U.S. at 845, 118 S.Ct. at 1716.  Determining whether the right to due process has been violated requires a balancing of an individual's interest in liberty against the state's asserted reasons for restraining individual liberty.  *Youngberg*, 457 U.S. 320, 102 S. Ct. 2460.  To this end, the Supreme Court has "spoken of the cognizable level of executive abuse of power as that which shocks the conscience." *Lewis*, 523 at 846, 118 S. Ct. at 1717.  "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id.* at 849, 118 S.Ct. at 1718.  Negligence is "categorically beneath the threshold of constitutional due process." *Id.*  Deliberately indifferent conduct may suffice depending on the context. *Id.* at 850, 118 S. Ct. at 1718.  As the *Lewis* court explained,

> [d]eliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking.

*Id.*  Thus, as I interpret Supreme Court precedent, deliberate indifference is not a standard that differs from but falls within the concept of conscience-shocking when one considers the circumstances presented.

The Eighth Circuit's decision in *Moore v. Briggs* appears consistent with this understanding.  In *Moore*, the involuntarily committed plaintiff alleged that the defendants had violated his right to substantive due process by failing to protect him from the sexual assaults of another patient.  In addressing the plaintiff's claims, the Eighth Circuit did not specifically discuss the applicability of *Youngberg*, or engage in an analysis of the potentially applicable due process standards. *See generally, Moore v. Briggs*, 381 F.3d 771.  Instead, the court recognized that "[a] substantive due process violation requires proof that a government official's conduct was conscience-shocking and violated one or more fundamental rights." *Moore*, 381 F.3d at 773.  In

57

Deliberate indifference, under the Eighth Amendment, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970 1979 (1994); *Leach v. Dufrain*, 103 F.Supp.2d 542, 546 (N.D.N.Y. 2000) (citing *Farmer,* 511 U.S. at 837, 114 S. Ct. at 1979); *Waldo v. Goord*, No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (same). "In *Lewis*, the Court equated deliberate indifference for

---

addition, the court found that under the facts presented "the defendants acted under circumstances in which actual deliberation was practical . . . [and]. . . [t]herefore their conduct *may* shock the conscience of federal judges only if they acted with 'deliberate indifference.'" *Id.* (emphasis in original) (quoting *Lewis*, 523 U.S. at 851-52, 118 S.Ct. 1708, 1719). In discussing the concept of deliberate indifference in *Lewis*, the Supreme Court noted that "in the custodial situation of a prisoner, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Lewis*, 523 U.S. at 851, 118 S. Ct. at 1719. Analogizing to *Youngberg*, the Court stated, "[t]here, we held that a severely retarded person could state a claim under § 1983 for a violation of substantive due process if the personnel at the mental institution where he was confined failed to exercise professional judgment when denying him training and habilitation. The combination of the patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare." *Id*. at 852 n. 12, 118 S. Ct. 1719 n.12 (internal citations omitted). In view of the foregoing, I would interpret *Youngberg* narrowly, not as identifying a separate standard to be applied when measuring due process violations, but instead addressing a concept applicable in circumstances involving professional decision-making regarding an involuntarily committed plaintiff who relies on such professionals for his or her well being, and one that aids in the determination of whether the conduct at issue rises to the level of conscience-shocking in that environment.

substantive due process and Eighth Amendment purposes." *Moore*, 381

F.3d at 774 (citing *Lewis*, 523 U.S. at 849-40, 118 S.Ct. 1708).

As in *Vallen* and *Dove*, however, I find it unnecessary to resolve the

issue of which standard may here be appropriate since under any of the

potentially applicable standards plaintiff's claim of failure to protect must

fail.  Plaintiff's complaint describes two occasions on which he was

allegedly assaulted or attacked by other patients during his commitment at

the CNYPC.  The first incident occurred on September 18, 2006, shortly

after plaintiff was admitted.  Complaint (Dkt. No. 1) p. 7.  Lane concedes

that he was first struck by a football and then became involved in an

altercation with a fellow patient, as a result of which he claims to have

suffered injury to his face, nose and jaw.  Complaint (Dkt. No. 1) p. 7; Tr.

pp. 27-33.  Plaintiff also admits that he is unable to distinguish between the

injuries that he received from being hit by the football and those resulting

from the ensuing altercation.  *See* Plaintiff's Response to Defendants'

Local Rule 7.1(a)(3) Statement (Dkt. No. 84).  The only treatment that was

required for plaintiff's resulting injuries was pain medication for his

discomfort.

59

According to plaintiff's CNYPC records, upon observing the

altercation defendant Crociata attempted to intervene by getting between

the two patients and preventing further contact.  Higgins Decl. (Dkt. No. 75-

4) Exh. D, p. 114.  Immediately after the other patient was escorted away

from the area, Crociata approached plaintiff to see if he was hurt.  *Id.*

Plaintiff told Crociata that he had not been touched, and refused to let

Crociata speak to him any further.  *Id.*  While plaintiff disputes telling

Crociata that he was not touched, he does admit that after the incident

Crociata approached him and asked him what had happened; Lane claims,

however, that Crociata saw everything and states that he was angered by

Crociata's question, apparently interpreting it as racist.  Complaint (Dkt.

No. 1) p. 7; *see also* Tr. pp. 31-32.  Plaintiff also admits that Crociata saw

him for his injuries, but alleges Crociata did not examine him.  Tr. pp. 27-

33.

Significantly, plaintiff does not allege that he had any previous

difficulties with the patient with whom he was involved in the altercation, or

that the defendants had reason to know of the danger in exposing the two

to each other.  In fact, plaintiff states that he had "absolutely no" prior

interaction with that patient.  Tr. p. 28.  Additionally, plaintiff has failed to

allege that any other defendant had any involvement in this incident.

Based on these facts, no reasonable factfinder could conclude that any of

the defendants engaged in conduct that shocked the conscience,

substantially departed from accepted professional judgment, practices or

standards, or was deliberately indifferent to plaintiff's safety.  Simply

stated, the record discloses that the September 18, 2006 encounter

stemmed from an unforseen accident that escalated into an altercation and

that CNYPC staff immediately intervened and took appropriate action to

secure both individuals involved.

The second alleged incident occurred somewhere in the beginning of

October, when plaintiff claims he was "attacked" by another patient.

Complaint (Dkt. No. 1) p. 9.  Plaintiff does not identify a specific date or

recount the circumstances surrounding the alleged attack, nor does he

claim to have suffered any injury.  The record suggests an incident

occurred between plaintiff and another patient on October 3, 2006 in which

he and the other patient "had words."  Higgins Decl. (Dkt. No. 75-4) Exh. D,

p. 214.   There is no evidence in the record that plaintiff was physically

touched or in any way injured as a result of this incident.  To the contrary,

plaintiff admits that the only incident in which he received physical injury

occurred on September 18.  Tr. p. 44.  With regard to the October

instance, I find that plaintiff has failed to establish a sufficiently serious

deprivation to show that he was subjected to an unreasonably unsafe

condition and trigger the Fourteenth Amendment's protections.

In view of the foregoing, I find that plaintiff has failed to establish a

Fourteenth Amendment claim for failure to protect and/or intervene and,

accordingly, I recommend defendants' motion for summary judgment

relating to this claim be granted.

2.    Medical Care

"Courts have consistently held, in a variety of contexts, that the due

process rights of persons in a nonpunitive detention are greater than the

Eighth Amendment protections afforded to convicted prisoners."  *Haitian*

*Centers Council, Inc. v. Sale*, 823 F. Supp. 1028, 1043 (E.D.N.Y.1993)

(citing cases); *Owens v. Colburn*, 860 F.Supp. 966, 974 (N.D.N.Y. 1994),

*aff'd* 60 F.3d 812 (2d Cir. 1995) (citing cases).  "Persons in nonpunitive

detention have a right to 'reasonable medical care,' a standard

demonstrably higher than the Eighth Amendment standard that protects

prisoners: 'deliberate indifference to serious medical needs.'" *Owens*, 860

F. Supp. at 974 (quoting *Haitian Centers Council*, 823 F. Supp. at 1043-

44).  At a minimum, due process forbids conduct that is deliberately

indifferent to one that is involuntarily committed.  *Haitian Centers Council*,

823 F. Supp. at 1044.

        Plaintiff's medical indifference claim has as it genesis the now

familiar September 18, 2006 incident.  Plaintiff claims that after being

struck by a football and subsequently attacked by a fellow patient on that

date, he sought medical treatment from defendant Crociata; Lane also

alleges that he suffered back pain as a result of the events of that day.

Complaint (Dkt. No. 1) p. 7; Tr. pp. 27-33.  As was previously noted,

plaintiff was unable to distinguish the injuries sustained from being hit by

the football from those allegedly resulting from the altercation, if any.  Tr.

pp. 29-30.  Lane alleges that when defendant Crociata saw him, Crociata

told him, "[t]here's nothing wrong with you" and failed to perform an actual

examination.  Complaint (Dkt. No. 1) p. 7.

        Plaintiff's CNYPC records contradict plaintiff's version, revealing that

Crociata approached plaintiff immediately after the altercation to see if he was hurt, at which time plaintiff told him "I wasn't touched," and refused to let Crociata speak to him any further.  Higgins Decl. (Dkt. No. 79-4) Exh. D, p. 114.  Later in the day, plaintiff apologized to Crociata for his behavior, and complained of general discomfort.  *Id.*  As a result, Crociata promptly prescribed 600 milligrams of Motrin for plaintiff's pain.  *Id.*  A follow-up note by Nurse Jane Helfert shows that after receiving the Motrin plaintiff slept through the night, and made no further complaints about his pain.  *Id.* p. 115.

Plaintiff himself acknowledges that he did not report his injuries to Crociata, never complained to anyone that his back was hurting, and did not request any sort of pain medication for his alleged injuries.  Tr. pp. 32-33, 35-36.  Plaintiff also concedes that he was provided with ibuprofen and other pain medication when requested, including the day after the altercation.  Tr. p. 34.  Moreover, plaintiff is unable to articulate what follow up treatment he believes was constitutionally required.[21]  *Id.* at 38.

---

[21]     Plaintiff testified at his deposition that other than the particular day in question, whenever he asked for medical treatment it was provided, and "[i]n fact, I would give them credit, that their attentiveness to patients' conditions, medical conditions is good."  Tr. p. 36.

Based upon these facts, I have determined that no reasonable factfinder could conclude that there was an unreasonable or deliberately indifferent "denial" or delay in treatment of plaintiff on September 18, 2006. I therefore recommend that defendants' motion to dismiss plaintiff's medical indifference claim be granted.[22]

### 3.    Excessive Force

Plaintiff claims that on September 22, 2006, as a result of his refusal to talk to defendant Nowicki, he was beaten and held in restraints and thereby subjected to excessive force.  Complaint (Dkt. No. 1) p. 8.  As with plaintiff's failure to protect claim, the proper framework for analysis of this claim is the Fourteenth, and not the Eighth, Amendment.  *Youngberg*, 457 U.S. at 312, 102 S.Ct. at 2456.  "It bears remembering . . . that not all bodily harm caused by a government actor is actionable as a constitutional violation."  *West v. Whitehead*, No. 04-CV-9283, 2008 WL 4201130, at * 14

---

[22]    Plaintiff further alleges in his complaint, upon information and belief, that defendant Crociata "deliberately falsified official state documents with regards to plaintiffs [sic] request for medical attention."  Complaint (Dkt. No. 1) p. 7, 11.  To create a factual issue, the complaint must be based on personal knowledge, not on "mere 'information and belief' or hearsay."  *Cabassa v. Gummerson*, No. 01-CV-1039, 2006 WL 1559215, at *2 (N.D.N.Y. Mar. 30, 2006) (Lowe, M.J.).  Since plaintiff's speculative allegation is not supported by any evidence, and indeed, contradicts his own testimony that he saw Crociata and did not request treatment, the court has no reason to doubt the authenticity of CNYPC records.

(S.D.N.Y. Sept. 11, 2008) (citations omitted).  "Only when bodily harm is caused by government action 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,' will a constitutional violation result."  *Id.* (quoting *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007)).

In the Second Circuit, it is recognized that individuals in the non-seizure, non-prisoner environment have a substantive due process right to be free from the use of excessive force by their custodians.  *See Johnson v. Newburgh Enlarged School Dist.,* 239 F.3d 246, 253 (2d Cir. 2001) (citing *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995)).  Factors to be considered in examining excessive force claims include: "the need for the application of force, the relationship between the need and amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  *Id.* at 251-52 (quoting *Metzger v. Osbeck*, 841 F.2d 518, 520 (3d Cir. 1988)).  With respect to the last factor, the Second Circuit has explained that

> [i]f the force was 'maliciously or sadistically [employed] for the very purpose of causing harm in the absence of any legitimate

government objective and it results in substantial emotional suffering or physical injury, the conduct is presumptively unconstitutional . . . . [M]alicious and sadistic abuses of government power that are intended only to oppress or to cause injury, and serve no legitimate purpose unquestionably shock the conscience . . . [C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.

*Id*. at 252 (citations omitted).  "Whether conduct rises to the level of unconstitutional excessive force depends on the totality of circumstances." *West*, 2008 WL 4201130, at * 15 (citing *Johnson*, 239 F.3d at 254).[23]  This analysis was found applicable by the court in *West* to an excessive use of force claim asserted under section 1983 by a profoundly mentally retarded individual committed to a state-operated facility for developmentally disabled individuals.  *West,* 2008 WL 4201130, at *14-15.

Plaintiff claims that on September 22, 2006 he was called from the day room by Nowicki, who said that he wanted to talk to plaintiff in the side room.  Tr. p. 45.  Plaintiff responded by stating that he did not have

---

[23]     Plaintiff claims that defendants violated 14 N.Y.C.R.R. § 27.7(a), a New York regulation regarding use of restraint and seclusion in institutional care.  Review of this provision and the record before the court suggests that defendants fully complied with this regulatory provision.  Even if they did not, however, "[a] violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Cusamano v. Sobek*, 604 F.Supp.2d 416, 482 (N.D.N.Y. 2009) (Suddaby, J.) (collecting cases).

anything to say to Nowicki, at which point, plaintiff claims, Nowicki directed

the twenty treatment assistants that were standing there to "take him

down."  Tr. p. 46.  Plaintiff claims that he was then kicked and struck about

his body, placed in restraints and transported by gurney to some other

location where he was kept without being given food for two to three days,

except for a sausage sandwich; plaintiff admits being offered drinks but

states that he refused.  Tr. pp. 45-61.

According to defendants, on the day of the alleged incident plaintiff

had been hostile toward staff and residents, threatened to start a riot, and

refused counseling by Nowicki in the side room.  Nowicki Aff. (Dkt. No. 79-

5) ¶¶ 22-23.  Plaintiff was recorded as saying "[d]on't try to take me to the

side room or try to shoot me up, because when I come out of it, there will

be trouble.  That's a promise, not a threat."  Higgins Decl. (Dkt. No. 79-4)

Exh. D, p. 146.  Because plaintiff attempted to return from the hallway to

the day room, he was placed into a four point restraint for seven minutes,

pursuant to doctor's orders, and transported to the side room "without

injury or physical altercation".  Nowicki Aff. (Dkt. No. 79-5) ¶¶ 24-25;

Higgins Decl. (Dkt. No. 79-4), Exh. D, p. 146.

Nowicki states that after being restrained plaintiff continued to make threats and, consistent with hospital policy, remained in the side room with one-to-one supervision from 1:00 p.m. September 22, 2006 until 9:30 a.m. on September 25, 2006, during which time he was provided food and a mattress, slept and ate, and attended to his own daily self-care activities. Nowicki Aff. (Dkt. No. 79-5) ¶¶ 24-29.  Plaintiff's CNYPC records also indicate that plaintiff's activity was monitored at fifteen minute intervals and that plaintiff was provided meals, saw a psychiatrist and was permitted to meet with his parole officer.  Higgins Decl. (Dkt. No. 79-4) Exh. D, pp. 146-80.  The record also reveals, and plaintiff admits, that at various times over this three-day period Lane refused to interact with staff, and plaintiff acknowledges that the purpose in putting him in isolation was behavior modification.  Tr. pp 53-55, 60.

While the parties' versions of the events of September 22, 2006 vary, I do not find the differences material to the determination of this claim. Plaintiff does not dispute that he refused to go to the side room to speak with Nowicki, nor does he deny making threats in the day room.  The decision to put plaintiff in a four point restraint was made by a physician in

69

light of plaintiff's history, his serious threats, and his refusal to follow staff

direction.  Plaintiff does not claim to have been restrained for a period

longer than that necessary to transport him.  Plaintiff has produced no

evidence that the force that was used was malicious or sadistic, for the

very purpose of causing him harm.

Although plaintiff generally alleges that he sustained injury to his

back, shoulders and neck and was denied medical treatment as a result of

the incident, plaintiff does not specifically identify any injury or treatment

that was needed with specificity, and he does not allege that he has

suffered any continuing problems.  There is no evidence of any relevant

injury noted in plaintiff's CNYPC records.  The record indicates, and

plaintiff admits, that within two hours of being placed in the side room, he

was seen by a doctor, with whom he refused to speak.  Significantly,

plaintiff's allegation that he was denied medical treatment on that date

directly contradicts his deposition testimony to the effect that the only time

he was denied treatment was on September 18, 2006.  Tr. p. 36.

Based upon the record now before the court, no reasonable

factfinder could find defendant's conduct conscience-shocking.  Rather,

the record establishes that defendants were attempting in good faith to

discipline plaintiff and restore order as a result of his failure to follow

directions and his continuous threats to patients and staff at the facility.  I

therefore recommend that defendants' motion for summary judgment as to

this claim be granted, and that plaintiff's excessive force claim be

dismissed.[24]

>    G.    First Amendment

"The First Amendment Guarantees the right to 'petition the

Government for a redress of grievances.'" *McKithen v. Brown*, 565

F.Supp.2d 440, 458 (E.D.N.Y. 2008) (quoting U.S. Const. amend. I).  Out

of the Petition Clause of that amendment arises the right of access to

courts, *City of New York v. Beretta U.S.A Corp.*, 524 F.3d 384, 397-98 (2d

---

[24]     To the extent that plaintiff also challenges the conditions experienced while in isolation, I find that such a claim would fall squarely within the test enunciated in *Youngberg*.  The record shows that the decisions to place plaintiff in four point restraints, to isolate him and to release him were all made by a physician and effectuated in accordance with hospital policy.  These decisions are entitled to deference, and are therefore presumptively valid.  *Youngberg,* 457 U.S. at 322-23, 102 S.Ct. at 2461-62.  While plaintiff disputes being provided with regular meals, he admits being provided at least one meal and offered liquids, and he has failed to come forward with any evidence demonstrating that the conditions of his confinement were a substantial departure from accepted professional judgment, practice or standards.  *Id.* at 323, 102 S.Ct. at 2462; *Zigmund v. Foster*, 106 F.Supp.2d 352, 361-62 (D. Conn. 2000).  Accordingly, any claim by plaintiff that he was denied due process by the conditions of his isolation should also be dismissed as a matter of law.

Cir. 2008), *cert. denied* 129 S. Ct. 1579 (2009), as well the right to petition

for redress for grievances without retaliation.  *Franco v. Kelly*, 854 F.2d

584, 589 (2d Cir. 1988).

           1.    <u>Access to the Courts</u>

    Although not specifically stated in his complaint, defendants suggest

that when liberally construed in light of his deposition testimony plaintiff's

complaint makes a claim of denial of access to the courts.[25]

    Without question, an inmate's constitutional right to "meaningful"

access to the courts is firmly established.[26]  *Bounds v. Smith*, 430 U.S.

817, 823, 97 S. Ct. 1491, 1495 (1977) (citations and internal quotation

marks omitted).  "However, this right is not an abstract, freestanding right

to a law library or legal assistance and cannot ground a Section 1983 claim

without a showing of actual injury."  *Collins v. Goord*, 438 F.Supp.2d 399,

415 (S.D.N.Y. 2006) (quoting *Lewis v. Casey*, 518 U.S. 343, 351, 116 S.Ct.

---

[25]     Plaintiff testified that prior to his family providing him a magnifier in mid-October he was unable to litigate and challenge his illegal commitment.  Tr. p. 62.

[26]     Although plaintiff was not a prisoner but involuntarily committed at CNYPC at all times relevant to this claim, the right of access to court evolves from the First Amendment and thus the analysis is the same in either context.  *See Lombardo v. Holanchock*, No. 07 Civ. 8674, 2008 WL 2543573, at *7 n.6 (S.D.N.Y. June 25, 2008); *see also Samuels v. Stone*, No. 98 Civ. 776, 1999 WL 624549, at *4 (S.D.N.Y. Aug. 17, 1999).

2174 (1996) (internal quotations omitted).  Thus, "[t]o survive a motion for summary judgment, plaintiff must present evidence showing that he has suffered actual injury."  *Jarecke v. Hensley*, No. 3:07-cv-1281, 2009 WL 2030394, at *9 (D. Conn. July 9, 2009) (citing *Lewis v. Casey,* 518 U.S. at 351-52).  To prove an actual injury, a plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of the defendants.[27]  *Abdul-Matiyn*, 2008 WL 974409, at * 13.

Plaintiff has failed to prove his claim that defendants' failure to provide him with a laptop computer with zoom text, a scanner and inkjet color printer, 7x magnifier, books on tape, high intensity lamp and 20/20 pens as requested in his letter to defendant Sawyer on October 13, 2006, resulted in his inability to pursue any legal action.  *See* Plaintiff's Motion for Partial Summary Judgment (Dkt. No. 57-4), Exh. C.  In fact, plaintiff admits he was able to file all of the legal proceedings that he desired.  Tr. p. 67.  Moreover, as defendants explain in their motion for summary judgment, CNYPC patients are afforded access to the Mental Hygiene Legal Services

_____

[27]     In apparent recognition of some level of constraint necessarily imposed in institutional environments, courts have applied the standard applied to prison inmates to circumstances involving the involuntarily committed in claims relating to access to courts as well as retaliation.  *See Lombardo*, 2008 WL 2543573, at * 6 n.6; *Zigmund*, 106 F.supp.2d at 358.

("MHLS"), which provides "legal services, advice and assistance, including representation, with regards to the resident's hospitalization."  Dkt. No. 79-3, p. 12.  Plaintiff admits that he was familiar with the services MHLS provides, and actually attempted to bring an action with the assistance of that agency, but was transferred from CNYPC before the proceeding could move forward.  Tr. p. 10.  Because there is no evidence that plaintiff suffered actual injury due to defendants' alleged interference with his access to the courts, I recommend that any claim by plaintiff that he was denied such access be dismissed.

>    2.   Retaliation

In his complaint plaintiff alleges that defendants retaliated against him because he and his family complained to various governmental agencies and officials, and he insisted on filing criminal charges against another patient.  Complaint (Dkt. No. 1) p. 11.  "[C]riticism of governmental agencies is protected speech under the First Amendment."  *Olesen v. Morgan*, No. 1:06-CV-959, 2008 WL 5157459, at *4  (N.D.N.Y. Dec. 8, 2008) (quoting *Economou v. Butz*, 466 F.Supp. 1351, 1361 (S.D.N.Y. 1979) (footnote omitted)). When adverse action is taken by governmental

officials against a person being held in custody, motivated by his or her

exercise of a right protected under the Constitution, including the free

speech provisions of the First Amendment, a cognizable retaliation claim

under 42 U.S.C. § 1983 lies.  See *Franco,* 854 F.2d at 588-90.

In order to state a *prima facie* claim under section 1983 for retaliatory

conduct, a plaintiff must advance non-conclusory allegations establishing

that 1) the conduct at issue was protected; 2) the defendants took adverse

action against the plaintiff; and 3) there exists a causal connection between

the protected activity and the adverse action – in other words, that the

protected conduct was a "substantial or motivating factor" in the prison

officials' decision to take action against the plaintiff.  *Mount Healthy City*

*Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576

(1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes v.*

*Walker*, 239 F.3d 489, 492 (2d Cir. 2001).  If the plaintiff carries this

burden, then to avoid liability the defendants must show by a

preponderance of the evidence that they would have taken action against

the plaintiff "even in the absence of the protected conduct."  *Mount*

*Healthy*, 429 U.S. at 287, 97 S. Ct. at 576.  If taken for both proper and

improper reasons, state action may be upheld if the action would have

been taken based on the proper reasons alone.  *Graham v. Henderson*, 89

F.3d 75, 79 (2d Cir. 1996) (citations omitted).

Analysis of retaliation claims thus requires thoughtful consideration of

the protected activity in which the inmate plaintiff has engaged, the

adverse action taken against him or her, and the evidence tending to link

the two.  When such claims, which are exceedingly case specific, are

alleged in only conclusory fashion and are not supported by evidence

establishing the requisite nexus between any protected activity and the

adverse action complained of, a defendant is entitled to the entry of

summary judgment dismissing plaintiff's retaliation claims.  *Flaherty v.*

*Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983),*overruled on other grounds*,

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S. Ct. 992 (2002).

The right to file a grievance and petition the government for redress

is "among the most precious of the liberties safeguarded by the Bill of

Rights."  *Franco,* 854 F.2d at 589 (quoting *United Mine Workers v. Illinois*

*State Bar Ass'n*, 389 U.S. 217, 222, 88 S. Ct. 353, 356 (1967)).  Plaintiff

therefore easily meets the first prong of the governing test by

demonstrating that he engaged in protected activity.

It is in connection with the requirement that the two be linked that plaintiff's retaliation claim falls short.  Plaintiff first claims that defendants retaliated against him by falsifying documents in order to have him removed from the facility.  Complaint (Dkt. No. 1) p. 11.  Lane has failed to offer proof, however, showing that any document was falsified by defendants with the intent to have plaintiff removed from CNYPC.   As District Judge David N. Hurd recognized in his decision in *Barclay v. New York*, 477 F.Supp.2d 546 (N.D.N.Y. 2007), in cases involving allegations of retaliation based on the filing of allegedly false misbehavior reports, "[t]he difficulty lies in establishing a retaliatory motive." *Barclay*, 477 F. Supp. 2d at 558. More than conclusory allegations are required to survive a summary judgment motion; the "types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." *Id.* (citations omitted); *see also Rivera v. Goord*, 119 F.Supp.2d 327, 339 (S.D.N.Y. 2000).

77

Here, the evidence in the record overwhelmingly demonstrates that from the outset and repeatedly throughout his confinement at CNYPC, plaintiff voiced both his discontent with being placed at the facility and his desire to return to prison.  There is ample evidence in the record demonstrating that while confined at CNYPC plaintiff was involved in more than one altercation and made repeated threats to the safety of staff and other patients, including threats to start a riot and to kill another patient; the event finally precipitating his removal was his threat to cut the throat of a treatment assistant.  Conversely, there is no evidence in the record that suggests that any document authored by any defendant was false, let alone that falsification of such document was motivated by a desire to retaliate against the plaintiff for his written complaints to various governmental agencies.  Moreover, the incident that caused plaintiff's removal from CNYPC also formed the basis for the parole violation that precipitated plaintiff's return to prison, for which he was afforded a hearing, was represented by counsel, and was permitted to cross-examine witnesses and present his own evidence, and he was ultimately found guilty.

The second incident that plaintiff attributes to retaliatory animus relates to his September 22-26, 2006 confinement in an isolated room after he insisted on filing criminal charges against a fellow patient who assaulted him.   Complaint (Dkt. No. 1) p. 11.   On this count, plaintiff fails to demonstrate that the alleged adverse action was prompted by protected conduct.   Preliminarily, it should be noted that plaintiff has repeatedly complained that he was prevented from filing any criminal charges, yet admits that following the September 18, 2006 altercation he participated in mediation with the other patient, leading to resolution of the matter.   Even assuming that plaintiff pursued criminal charges, his claim would fail as it is well established that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."   *Linda R.S. v. Richard D.*, 410 U.S. 614, 619, 93 S. Ct. 1146, 1149 (1973).   Accordingly, plaintiff had no constitutionally protected right to file a criminal complaint.   Finally, even if plaintiff had sufficiently established that he engaged in protected activity, he has failed to adduce any evidence demonstrating that his confinement in isolation was in any way related to his effort to pursue criminal charges in regard to the attack that occurred several days prior, or that it was

maliciously motivated by a retaliatory animus.

Because plaintiff has failed to produce any evidence to support his retaliation claims, I recommend that this portion of defendants' motion for summary judgment be granted, and that those claims be dismissed.

### 3.   Investigation of Complaints

Plaintiff's tenth cause of action purports to allege a claim for the acts or omissions of defendant Beebe in failing to investigate plaintiff's complaints regarding the conditions of confinement at the CNYPC. Complaint (Dkt. No. 1) p. 8, 12.  Although the right to petition government is well established, there is no corresponding duty on the part of the government to act.  *Prestopnik v. Whelan*, 253 F.Supp.2d 369, 375 (N.D.N.Y. 2003) (citations omitted), *aff'd* 83 Fed. Appx. 363 (2d Cir. 2003); *Wolf v. Town of Mount Pleasant*, No. 06 Civ. 3864, 2009 WL 1468691, at *6 (S.D.N.Y. April 27, 2009) (citing *Bernstein v. New York*, 591 F.Supp.2d 448, 460 (S.D.N.Y. 2008)).  Plaintiff has, therefore, failed to allege a cognizable claim.[28]

---

[28]     Moreover, the record belies plaintiff's assertion that defendant Beebe failed to properly investigate the complaints made by plaintiff and his wife relating to plaintiff's treatment while committed at CNYPC.  Defendant Beebe was assigned to investigate the complaints made by plaintiff and either engaged in personal phone calls or exchanged voice mail messages with plaintiff's wife on October 1, 2006,

I therefore recommend that all claims against defendant Beebe be dismissed.

## H.   Personal Involvement

Defendants move to dismiss all claims asserted by Lane against defendants Carpinello and Sawyer based upon their lack of personal involvement in the allegedly offending conduct.  At the outset, because the court has determined that plaintiff was not denied a constitutional right, his supervisory claims against Carpinello and Sawyer should be dismissed. *See  Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983).  Even if there were a cognizable claim, however, the claims against Carpinello are subject to dismissal based upon a lack of personal involvement.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  In order to prevail on a section 1983 cause of action against

---

October 23, 2006, November 1, 2006, November 3, 2006 and November 7, 2006. Defendants' Response to Request for Admissions (Dkt. No. 62-3) ¶¶ 8-9.  The record also shows that Beebe's investigation included a personal visit to CNYPC on November 21, 2006.  Higgins Decl.  (Dkt. No. 79-4) Exh. E, pp. 32-33.

an individual, a plaintiff must show some tangible connection between the

constitutional violation alleged and that particular defendant.  *See Bass v.*

*Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).   A supervisor can be found to

have personal involvement in a constitutional violation if the evidence

shows:

> 1) the defendant participated directly in the alleged constitutional
> violation, 2) the defendant, after being informed of the violation
> through a report or appeal, failed to remedy the wrong, 3) the
> defendant created a policy or custom under which unconstitutional
> practices occurred, or allowing the continuance of such a policy or
> custom, 4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or 5) the defendant
> exhibited deliberate indifference to the rights of inmates by failing to
> act on information indicating that unconstitutional acts were
> occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (1995) (quoting *Wright,* 21 F.3d at

501).

Plaintiff's claims against defendant Carpinello, Commissioner of the

New York State OMH, and defendant Sawyer, the director of CNYPC, are

premised exclusively upon their roles as supervisors.  Plaintiff alleges that

Carpinello was involved in the refusal of plaintiff's requests for

accommodations under the ADA, refused to hire a disabilities rights

coordinator, demonstrated deliberate indifference to his needs, failed to

supervise employees at the facility, and instituted policies and procedures

that she knew, or should have known, were unlawful.   Complaint (Dkt. No. 1) pp. 9-12.  For this claim plaintiff relies on a letter that he wrote to Carpinello in mid-October asking to be placed in protective custody and transferred from CNYPC.  Complaint (Dkt. No. 1) p. 9.  Plaintiff admits that he never received a response to his letter.  Complaint (Dkt. No. 1) p. 9.

Plaintiff's allegations against Sawyer are similar.  On October 13, 2006 plaintiff sent defendant Sawyer a letter requesting certain accommodations under the ADA, including such things as a laptop computer, a magnifier and books on tape.  Dkt. No. 57-4, Exh. C. Additionally, plaintiff alleges that Carpinello and Sawyer should have been aware of his complaints by virtue of the letters that he and his wife had written to various state agencies and public officials.  The mere receipt of a letter of complaint alone, however, is insufficient to establish personal involvement and liability under section 1983.  *Porter v. Goord*, No. 04-CV-0506F, 2009 WL 2386052, at *5 (W.D.N.Y. July 20, 2009) (citations omitted); *Lyerly v. Phillips*, No. 04 Civ. 3904 (PKC), 2005 WL 1802972, at *7 (S.D.N.Y. July 29, 2005) (Castel, J.) (citing *Johnson v. Wright*, 234 F.Supp.2d 352, 363 (S.D.N.Y. 2002)).[29]

---

[29]     Plaintiff's conclusory allegations that Carpinello and Sawyer were also made aware by repeated telephone calls are also insufficient.  He fails to identify when

Plaintiff also claims that there existed an unwritten policy and custom of patient abuse and assault at CNYPC, which had been in place for many years.  Yet, plaintiff has produced no evidence of instances of alleged assault or abuse of patients, aside from the incident on September 22, 2006, of which he now complains.  In opposition to defendants' motion, Lane offers the affidavit of John Palombo (Dkt. No. 84-6), a former patient confined at CNYPC from July, 2006, until November of 2007.  The Palombo affidavit, however, is fatally conclusory.  Palombo states that he personally witnessed staff members attack and beat patients at CNYPC on a least six different occasions, but fails to identify with any specificity the dates on which such beatings allegedly occurred, the patients that were involved, or the circumstances surrounding the alleged beatings.  *Id.* ¶ 13.  Nor does Palombo allege that supervisors were notified or aware of the matter, or that complaints were made about these incidents.  In fact, plaintiff has produced no evidence of any complaints of abuse made by or on behalf of patients, other than his own.  In view of the foregoing, I conclude that the evidence in the record is insufficient to permit a

------------------------

and by whom such alleged telephone calls were made, whether he or someone on his behalf spoke to Carpinello or Sawyer, and if so, the substance of such alleged conversations.

reasonable juror to find the existence of an unwritten policy or custom of

patient abuse at CNYPC.  *See Lipton v. County of Orange*, 315 F.Supp.2d

434, 447 (S.D.N.Y. 2004).

For the foregoing reasons, I recommend that defendants' motion for

summary judgment dismissing the claims against Carpinello and Sawyer

for lack of personal involvement be granted.[30]

I.     Conspiracy

Embedded within plaintiff's complaint, though not separately stated,

is a conspiracy claim asserted under 42 U.S.C. §§ 1983 and 1985.[31]

Defendants also seek dismissal of that claim.

1.     Section 1983

To sustain a conspiracy claim under 42 U.S.C. §1983, a plaintiff must

demonstrate that a defendant "acted in a wilful manner, culminating in an

agreement, understanding or meeting of the minds, that violated the

_____

[30]     Although defendants do not move to dismiss the claims against defendant Barboza, Director of the SOTP, for lack of personal involvement, it appears that the only basis for plaintiff's claims against her result from her supervisory role. The sole allegations made by the plaintiff relating to defendant Barboza are that he wrote two separate letters to her complaining of his circumstances at CNYPC.  As noted above, these allegations, even if true, are insufficient to support liability against Barboza, *Porter*, 2009 WL 2386052, at *5, and I find that all claims against her should be dismissed for lack of personal involvement.

[31]     Plaintiff's complaint additionally alleges violation of 42 U.S.C. § 1984.  No such provision exists.

85

plaintiff's rights . . . secured by the Constitution or the federal courts."

*Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) (citations and

internal quotation marks omitted).  Conclusory, vague or general

allegations of a conspiracy to deprive a person of constitutional rights do

not state a claim for relief under section 1983.  *See Sommer v. Dixon*, 709

F.2d 173, 175 (2d Cir. 1983), (per curiam) cert. denied, 464 U.S. 857, 104

S. Ct. 177 (1983).  In order to support a claim of conspiracy to commit a

civil rights violation, a plaintiff must establish the existence of such a

deprivation; a claim of conspiracy, standing alone, is insufficient to support

a finding of liability under section 1983.  *Britt v. Garcia*, 457 F.3d 264, 269-

70 (2d Cir. 2006); *Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir. 1993)

(collecting cases).

　　　　Plaintiff's conspiracy claim, if existing at all, appears to rest entirely

upon an e-mail from defendant Babula, a treatment assistant, to defendant

Barboza, the director of the SOTP at CNYPC, dated October 20, 2006,

which plaintiff construes as a concerted effort to have plaintiff's parole

violated.  Lane Aff. (Dkt. No. 84-2) Exh. C, p. 12.  In the e-mail Babula

expresses his concerns relating to plaintiff's continuing threatening conduct

and goes on to say, "Sharon if there is a way to get this man violated, and

you could do it, you need to..." *Id.*  While this e-mail reflects defendant Babula's safety concerns about plaintiff's continued presence at CNYPC, it is not sufficient to raise a question of fact precluding summary judgment dismissing plaintiff's claim of conspiracy.

I note that because I have not found that plaintiff's complaint states a sustainable claim for deprivation of a constitutional right, his conspiracy claim is likewise subject to dismissal for failure to state a cause of action. *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997).  Moreover, plaintiff has offered only conclusory allegations that defendants acted in a wilful manner, culminating in an agreement, understanding or meeting of the minds, to violate plaintiff's rights, and for this reason as well his claim of conspiracy fails.

### 2.   Section 1985

Plaintiff's complaint also alleges violation of 42 U.S.C. § 1985.   To sustain a cause of action for conspiracy to violate civil rights under section 1985(3), a plaintiff must allege and demonstrate that defendants acted with racial or other class-based animus in conspiring to deprive the plaintiff of his or her equal protection of the laws, or of equal privileges and immunity secured by law. *United Brotherhood of Carpenters & Joiners, Local 610,*

*AFL-CIO v. Scott*, 463 U.S. 825, 834-39, 103 S. Ct. 3352, 3359-61 (1983);

*Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir. 1994); *Gleason v.*

*McBride*, 869 F.2d 688, 694 (2d Cir. 1989); *Patterson v. County of Oneida*,

No. 5:00-CV-1940, 2002 WL 31677033, at *4 (N.D.N.Y. Oct. 30, 2002)

(Hurd, J.), *aff'd in relevant part*, 375 F.3d 206 (2d Cir. 2004); *Benson v.*

*United States*, 969 F. Supp. 1129, 1135-36 (N.D. Ill. 1997) (citing, *inter*

*alia*, *United Brotherhood*, 463 U.S. at 434-37); *see also LeBlanc-Sternberg*

*v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995).  A plaintiff asserting a claim

under section 1985(3) need not necessarily offer proof of an explicit

agreement; a conspiracy can, in the alternative, be evidenced

circumstantially, through a showing that the parties had a "'tacit

understanding to carry out the prohibited conduct.'"  *LeBlanc-Sternberry*,

67 F.3d at 427 (quoting *United States v. Rubin,* 844 F.2d 979, 984 (2d

Cir.1988)).  This notwithstanding, in order to properly plead such a claim, a

plaintiff must make more than "conclusory, vague, or general allegations of

conspiracy."  *Sommer v. Dixon*, 709 F.2d at 175; *Williams v. Reilly*, 743 F.

Supp. 168, 173 (S.D.N.Y. 1990) ("[u]nsubstantiated, conclusory, vague or

general allegations of a conspiracy to deprive constitutional rights are not

enough to survive [even] a motion to dismiss").  "[D]iffuse and expansive

allegations are insufficient, unless amplified by specific instances of misconduct." *Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (quoting *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)).  Moreover, it is well settled that a plaintiff attempting to establish a claim under section 1985(3) must demonstrate that the defendant under consideration acted with class-based, invidiously discriminatory animus. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 266-68, 113 S. Ct. 753, 758-759 (1993).

Plaintiff's claim of conspiracy under section 1985 fails for the same reasons that require dismissal of his conspiracy claim alleged under section 1983.  Plaintiff's section 1985 claim is also subject to dismissal based upon the fact that plaintiff has produced no evidence of any class-based discriminatory animus.

In view of the foregoing, I recommend that defendants' motion as to plaintiff's conspiracy claims be granted, and that plaintiff's conspiracy claims be dismissed.[32]

_____

[32]     Plaintiff's conspiracy claim, as alleged in his sixth cause of action, names Nowicki, Lucenti, Crociata, Menz, Coppola and Babula, all of whom were employed at the CNYPC.  In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine

IV.   <u>SUMMARY AND RECOMMENDATION</u>

Plaintiff asserts a variety of claims in his complaint relating to his involuntary commitment to CNYPC in September and October of 2006. Having carefully reviewed the extensive record before the court and considered both plaintiff's motion for partial summary judgment and defendants' cross motion for summary judgment, I find that defendants are entitled to qualified immunity with regard to plaintiff's claim that he was committed to CNYPC in violation of his right to procedural due process[33] and that defendants are entitled to immunity under the Eleventh Amendment for all of plaintiff's claims against them in their official capacities and for alleged violations of the ADA in their individual capacities, and that such claims should therefore be dismissed.  As to plaintiff's remaining claims under the ADA, I conclude that he has failed to

---

provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances. *See, e.g., Everson v. New York City Transit Auth.*, 216 F.Supp.2d 71, 75-76 (E.D.N.Y. 2002); *Griffin-Nolan v. Providence Washington Ins. Co.*, No. 5:05CV1453, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.).  Plaintiff's conspiracy claim is thus also subject to dismissal on this basis.

[33]     Because I have already concluded that plaintiff has failed to allege any other constitutional violations during plaintiff's commitment at CNYPC, I have declined to address the defense of qualified immunity with respect to plaintiff's remaining claims.

prove any violation of his rights under Title II of that statute, and that these

claims should also be dismissed on the merits, as a matter of law.  In

addition, I find that plaintiff cannot state a claim under the Eighth

Amendment for conditions arising out of his confinement in CNYPC, and

that he has failed to establish claims under the Fourteenth Amendment for

failure to protect and/or intervene, medical indifference, or excessive use

of force, and that these claims therefore are similarly subject to dismissal.

Likewise, I have determined that plaintiff has failed to establish that he was

denied access to the courts, that defendants' retaliated against him, or that

he was otherwise denied his First Amendment rights, including by

defendant Beebe's alleged failure to investigate, and accordingly

recommend that all First Amendment claims asserted by Lane be

dismissed.  Because I find that plaintiff has failed to establish a

constitutional violation or violation of the ADA, plaintiff's claims of

conspiracy as well as those for supervisory liability against defendants

Carpinello, Sawyer and Barboza are also subject to dismissal.

Additionally, I find that plaintiff has failed to produce any evidence of a

conspiracy, or of the personal involvement of Carpinello, Sawyer and

Barboza, and therefore recommend dismissal of plaintiff's conspiracy

claims and those against Carpinello, Sawyer and Barboza on this basis as well.  Accordingly, it is hereby respectfully

RECOMMENDED that plaintiff's motion for partial summary judgment (Dkt. No. 57) be DENIED, defendants' cross motion for summary judgment (Dkt. No. 79) be GRANTED, and plaintiff's complaint be DISMISSED in its entirety.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within TEN days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a) and 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:      August 31, 2009
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge